**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 5 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 97-6146

ROBERT JOHNSTON,

Defendant - Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D. Ct. No. CR-96-115-L)**

Fred L. Staggs, Oklahoma City, Oklahoma, appearing for Defendant-Appellant.

Timothy W. Ogilvie, Assistant U.S. Attorney (Patrick M. Ryan, U.S. Attorney, with him on the brief), Office of the United States Attorney, Oklahoma City, Oklahoma, appearing for Plaintiff-Appellee.

Before **TACHA**, **BRORBY**, and **EBEL**, Circuit Judges.

**TACHA**, Circuit Judge.

Robert Johnston was a defense attorney in Oklahoma City. Richard Jarvis, a drug dealer who previously had used Johnston for legal representation on other matters, asked Johnston to lie on Jarvis's behalf by telling two men to whom

Jarvis owed drug money that Jarvis had been arrested. The purpose of the false story was to deter the two men from making further contact with Jarvis. Johnston complied with Jarvis's request, and Jarvis was never bothered again about the money he owed. Thereafter, Jarvis continued to deal drugs. For his lies, Johnston was convicted of one count of conspiracy to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and three counts of use of a telephone to facilitate the distribution of marijuana, in violation of 21 U.S.C. § 843(b). Johnston raises four issues on appeal. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## BACKGROUND

In the fall of 1995, Drug Enforcement Administration agents began investigating Jarvis, whom they had identified as an Oklahoma City marijuana dealer. An Oklahoma state court order authorized the agents to tap Jarvis's home and business telephone lines. Two men, known only as Alex and Ramone, fronted Jarvis 200 pounds of marijuana for $110,000, meaning Jarvis obtained the drugs on credit. Jarvis, in turn, fronted the drugs to three other dealers. Apparently, the drug business was slow, and Jarvis's customers could not fully pay him for the drugs. In turn, Jarvis could not fully pay Alex and Ramone the money he owed them. According to Jarvis's testimony at trial, Alex threatened to kill Jarvis if Jarvis did not soon pay off the balance of the debt.

Thereafter, Jarvis called Johnston, who previously had represented him on other non-drug related matters. Jarvis asked Johnston for help in concocting a story to make it appear to Alex and Ramone that Jarvis had been arrested for dealing drugs so that they would avoid future contact with him. Jarvis asked Johnston to tell the story to Alex and Ramone. Johnston agreed. He initially told Kirby Kyles, one of Jarvis's customers, that Jarvis had been arrested, anticipating that Kyles would pass that information along to Alex and Ramone. Kyles did tell Alex and Ramone the story. Alex and Ramone then came to Johnston's office to confirm the story, and Johnston verified the canard. The DEA learned about Johnston's involvement in the scheme through the phone taps on Jarvis's phones.

The grand jury indicted Johnston on one count of conspiracy to distribute marijuana, four counts of using a telephone to facilitate the distribution of marijuana, and one count of attempt to possess decadurobolin, a steroid. Before trial began, the defendant pleaded guilty to the steroid charge. After a three-day trial, a jury returned a guilty verdict against Johnston on the conspiracy charge and on three of the four use-of-telephone charges. He was sentenced to 26 months in prison on the conspiracy count, 26 months on each of the use-of-telephone counts, and 12 months on the steroid charge, with all sentences running concurrently.

On appeal, Johnston asserts that (1) there was insufficient evidence to

convict him of any of the charged counts; (2) the district court committed reversible error by denying certain jury instructions; (3) the district court should have suppressed the intercepted phone conversations between Jarvis and Johnston because the interceptions were not made in conformity with the order authorizing the phone taps; and (4) the district court erred in computing the defendant's offense level under the sentencing guidelines.

## DISCUSSION

I.   **Sufficiency of the Evidence**

In determining whether there is sufficient evidence to support the jury's verdict, this court reviews the record de novo. See, e.g., United States v. Wilson, 107 F.3d 774, 778 (10th Cir. 1997). Evidence is sufficient to support a conviction if, considered in the light most favorable to the government, it would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt. See id. In evaluating the evidence under this standard, the court will not question a jury's credibility determinations or its conclusions about the weight of the evidence. See United States v. Johnson, 57 F.3d 968, 971 (10th Cir. 1995).

A.   Conspiracy Charge

The defendant contends that the evidence presented at trial was insufficient as a matter of law to establish the agreement and intent elements to the conspiracy charge. The drug conspiracy statute provides, "Any person who

- 4 -

attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846. Johnston was convicted of conspiracy to violate 21 U.S.C. § 841(a)(1), which criminalizes the knowing or intentional distribution of marijuana. To obtain a conviction under section 846, the government must prove that "the defendant knew at least the essential objectives of the conspiracy and knowingly and voluntarily became a part of it." United States v. Johnson, 42 F.3d 1312, 1319 (10th Cir. 1994). The government is not required to prove the commission of an overt act in furtherance of the conspiracy. See id. (citing United States v. Shabani, 513 U.S. 10, 11 (1994)).

The jury may infer an agreement constituting a conspiracy "from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose." Id. Furthermore, "the jury may presume that a defendant is a knowing participant in the conspiracy when he acts in furtherance of the objective of the conspiracy." Id. (citations and internal quotation marks omitted). The defendant's participation in or connection to the conspiracy need only be slight, so long as sufficient evidence exists to establish the defendant's participation beyond a reasonable doubt. See United States v. Bowie, 892 F.2d 1494, 1497 (10th Cir. 1990). There is no question that Jarvis

was engaged in a conspiracy to sell marijuana. The only question is whether Johnston knowingly and intentionally entered into that conspiracy when he told Kyles and verified to Alex and Ramone that Jarvis had been arrested.

The defendant testified at trial that he thought Jarvis was no longer involved in the drug business, and that he only agreed to tell the false story to help Jarvis complete his withdrawal from the conspiracy and save Jarvis's life. There is ample evidence, however, that would allow a reasonable juror to find beyond a reasonable doubt that the defendant's contention that he intended to help Jarvis withdraw was untrue, and that Johnston really intended to help Jarvis continue his drug business. At trial, Jarvis testified about a meeting between him and Johnston in which Jarvis explained to Johnston why he wanted Johnston to participate in the scheme:

> Q. Okay, and what did you talk about with respect to Alex and Ramone at your meeting [with Johnston] the next day?
> A. I told Robert [Johnston] that Kirby and John and Glen owed me some money. They wouldn't pay me. [Alex and Ramone] pulled a gun on me. They were going to kill me. And then I come up with the scheme that I wanted to get arrested or let them think that I got arrested to where they would leave me alone until I could get Kirby and John and Glen to pay me.

Trial Tr. at 42. In this meeting, Jarvis informed Johnston that Johnston's lie would give Jarvis more time to collect the money that his customers (i.e., Kirby, John, and Glen) owed him. This is a clear indication to Johnston that Jarvis was *not* out of the drug business. The jury could believe beyond a reasonable doubt

that Jarvis was telling the truth about this meeting. The jury could also believe beyond a reasonable doubt that Johnston was lying when he testified that he thought Jarvis was out of the drug business.

In addition, there is evidence in the form of testimony from Jarvis and Kirby Kyles that Jarvis paid Johnston $2,000 for his participation in perpetrating this scheme. Johnston contends that this payment was for past legal services rendered, but a jury could reasonably believe otherwise. The payment is clear evidence that Johnston had a financial stake in the drug conspiracy.

There is also evidence from which a jury could reasonably conclude that Johnston manufactured his testimony about his belief that Jarvis was out of the drug business. In a wiretapped conversation between Johnston and Jarvis, Johnston told Jarvis that he had just met with Alex and Ramone and verified the lie to them. In that conversation, Johnston and Jarvis display an astonishing degree of glibness in talking about their scheme, particularly in light of the fact that the pair's alleged purpose in perpetrating the lie was to save Jarvis's life:

| | |
|---|---|
| JARVIS: | Hello |
| JOHNSTON: | ---- damn, I tell you what, that little Mexican was jumping around my office like somebody stuck a cigarette up his ---- . (laugh) They do look funny when they turn white (laugh) oh ----. |
| JARVIS: | I told them [the police] mentioned their names and wooh. |
| JOHNSTON: | Yep. Yep. |
| JARVIS: | Boy they . . . |
| JOHNSTON: | (laugh) |

| JARVIS: | I was sittin' there watchin' that son of a ---- change colors . . . ---- damn. |
| ROBERT: | Well, I . . . I think your concerns were unfounded. |
| JARVIS: | Okay (laugh). |
| ROBERT: | I get that impression.  They're going to take a little vacation. |

Appellant's br. at 19.  From the cavalier manner in which Johnston conducted himself in this conversation, the jury would have been justified in disbelieving Johnston's story.

In sum, the jury was faced with the following scene.  At the request of a client whom Johnston knew to be a drug dealer, Johnston agreed to lie to two other drug dealers in order to deter them from trying to collect a drug debt.  Jarvis incurred that drug debt because Alex and Ramone fronted him money; he could not pay because his customers had not yet paid him.  Jarvis needed a way to delay or inhibit the collection of that drug debt, and so he enlisted Johnston's help.  A reasonable juror could conclude beyond a reasonable doubt that Johnston knew that (1) Alex and Ramone had fronted Jarvis drugs, which Jarvis had in turn fronted to other drug dealers; (2) Jarvis could not pay Alex and Ramone for all of the fronted drugs because Jarvis's customers had not yet sold all of it; (3) his lie would cause Alex and Ramone to cease contact, at least temporarily, with Jarvis; (4) because Alex and Ramone would cease contact with Jarvis, Jarvis's customers would have more time to sell the remainder of the fronted drugs and Jarvis would have more time to collect the remainder of the money due on those drugs; and (5)

Jarvis actually intended to continue collecting the money on the fronted drugs. Indeed, this is exactly what occurred. Jarvis never had to repay the debt because Alex and Ramone disappeared. Johnston's lie allowed Jarvis and his customers to keep the profits generated by the subsequent marijuana sales. The evidence was sufficient to establish that Johnston knowingly and intentionally entered into a conspiracy to distribute marijuana.

The defendant also contends that the government failed to prove its case because it did not prove that he conspired with all of the co-conspirators named in the indictment. "A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment." United States v. Ailsworth, --- F.3d ---, 1998 WL 101788 at *4 (10th Cir. 1998) (citations and internal quotation marks omitted). A variance constitutes reversible error only if it affects a defendant's substantial rights. See id. In this case, however, there is no variance. The indictment charged that "Alfredo Vega, Emmanuel Reyes, Victor Rodriguez, and Robert Johnston did knowingly and intentionally combine, conspire, confederate and agree together with each other and with others both known and unknown to the Grand Jury to knowingly and intentionally distribute, and possess with intent to distribute, marijuana . . . ." Thus, the government was not required to prove that Johnston conspired with any or all of the named co-defendants, so long as it at least proved that he conspired "with others" for the

purpose alleged. As already discussed, the evidence was sufficient to show that Johnston conspired with Jarvis to facilitate the distribution of marijuana.

B.    Section 843(b) Charges

The defendant also contends that the evidence was insufficient as a matter of law to prove the intent element of each of the three use-of-telephone charges brought under 21 U.S.C. § 843(b). To obtain a conviction under section 843(b), the government must prove that the defendant (1) knowingly or intentionally (2) used a telephone or other communications facility (3) to "commit, cause or facilitate" the commission of a drug felony. United States v. Milton, 62 F.3d 1292, 1294-95 (10th Cir. 1995).

Johnston agreed to lie on Jarvis's behalf on October 27, 1995 in a meeting with Jarvis at Johnston's office. The three Jarvis-Johnston phone conversations underlying the section 843(b) convictions occurred on October 30 and 31, 1995. In the first intercepted conversation, Johnston confirmed that he had told Kyles that Jarvis had been arrested. Johnston said, "[T]hat seed got planted . . . this morning," to which Jarvis responded, "Yeah, Kirby called me." Appellant's Br. at 14. In the second conversation, Johnston confirmed to Jarvis that Alex and Ramone were planning to visit Johnston's office soon thereafter to verify the arrest story. See id. at 17-18. In the third, Johnston called Jarvis immediately after Alex and Ramone had left Johnston's office to tell Jarvis that he had verified

- 10 -

the false story to them. Johnston said, "I get that impression they're going to take a little vacation." Id. at 19.

It is clear that all three of these conversations relate to Johnston's dissemination of the false story, and the defendant does not contest this conclusion. Rather, he argues that he did not have the requisite intent to commit, cause, or facilitate a drug felony when he had these conversations. However, we have already concluded that there was sufficient evidence to establish that Johnston intentionally involved himself in the conspiracy to distribute marijuana when he agreed to disseminate the false story. It follows naturally that Johnston intended to facilitate the conspiracy in the three telephone conversations in which he discussed the false story with Jarvis. Thus, a reasonable jury could conclude beyond a reasonable doubt that, in these three separate instances, Johnston intentionally used a telephone to facilitate the commission of a drug felony.

## II. Jury Instructions

The defendant asserts that the district court erred by failing to give the jury two proposed instructions. "We review the instructions de novo to determine whether, as a whole, they adequately apprised the jury of the issues and the governing law," though we have also said that we review a court's refusal to give a particular instruction for an abuse of discretion. United States v. Wolny, 133 F.3d 758, 765 (10th Cir. 1998). "Little turns, however, on whether we label

review of this particular question abuse of discretion or *de novo*, for an abuse of discretion standard does not mean a mistake of law is beyond appellate correction. . . . The abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." Koon v. United States, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047-48 (1996). A trial court does not err so long as the instructions that it gives fairly state the governing law and provide the jury with an understanding of the issues and applicable standards. See United States v. DeSoto, 950 F.2d 626, 631 (10th Cir. 1991).

The first refused instruction that the defendant proposed stated, "The testimony of a perjurer should always be considered with caution and weighed with great care." R.O.A. doc. 78. The defendant contends that the district court should have given this instruction because another witness contradicted certain testimony of Kyles during the trial, and also because Kyles's testimony at trial contradicted some of his own testimony previously given before the grand jury. Therefore, the defendant argues, the district court should have specifically cautioned the jury regarding the weight to give Kyles's testimony. In refusing the instruction, the district court said,

> The Court feels like the instruction labeled "The Credibility of
> Witnesses and Impeachment" fully covers the law as it relates to the
> jury's determination of credibility of each witness and the
> inconsistent statements made by a witness. And the Court feels that
> the use of the term perjurer in the instruction itself could . . . have a
> legal connotation to the jury that the Court has made the

- 12 -

determination for it, and that is not the fact.

Trial Tr. at 204-05. We agree. Any concerns that the defendant had regarding the weight the jury would give the testimony of any witness were more than satisfactorily addressed by Instructions 11 and 12. Instruction 11 stated:

> You are the sole judges of the credibility or "believability" of each witness and the weight to be given to his testimony. In weighing the testimony of a witness you should consider the witness' relationship to the United States or the defendant and his interest, if any, in the outcome of the case; manner of testifying; criminal record . . . ; candor, fairness and intelligence; and the extent to which he or she has been supported or contradicted by other credible evidence. You may, in short, accept or reject the testimony of any witness in whole or in part.

R.O.A. doc. 86. Similarly, Instruction 12 informed the jury that "a witness may be discredited or impeached by contradictory evidence; or by evidence that at other times the witness has made statements which are inconsistent with the witness's present testimony." Id. The district court did not err in refusing the perjurer instruction.

The second refused instruction that the defendant asserts the district court should have given is a theory of the defense instruction. A district court must give a theory of defense instruction only if the court's instructions were erroneous or inadequate without it. See Wolny, 133 F.3d at 765. The defendant's proposed theory of the defense instruction stated,

> The Defendant, Robert L. Johnston, has pleaded "Not guilty" to the charges contained in the indictment. This plea of not guilty

- 13 -

puts in issue each of the essential elements of the offense described in these instructions and imposes on the government the burden of establishing each of these elements by proof beyond a reasonable doubt.

Defendant . . . contends that he is not guilty of the crimes charged because the government has failed to prove that the defendant and any other person arrived at any form of agreement to distribute marijuana.

An attorney at law does not join a criminal conspiracy by virtue of receiving the confidences of any of its participants of past crimes, nor by assisting any such member of a conspiracy in terminating his or her role in the conspiracy.

R.O.A. doc. 78. In refusing the instruction, the district court stated that the instruction contained arguments, which the defense could address in closing, rather than only statements of the law. Further, the court noted that its other instructions to the jury fully covered all of the issues presented in the instruction. Again, we agree.

Instruction Number 6, "Plea and Presumption of Innocence," stated that the defendant pleaded not guilty to each count and that, therefore, the government had the burden of proving its case beyond a reasonable doubt. These were the points raised in the first paragraph of the proposed instruction. The second paragraph of the proposed instruction merely states why the defendant believes he is not guilty and that the government did not prove its case. Such a statement is argument and is inappropriate for jury instructions.

The issues raised in the third paragraph of the proposed instruction were satisfactorily covered by Instructions 19, 20, and 21. Instruction 19 defined

conspiracy. Instruction 20 detailed what the evidence must show before a jury can find that a defendant was part of a conspiracy. In particular, the last paragraph of Instruction 20 stated, "Merely associating with others and discussing common goals, mere similarity of conduct between or among such persons, merely being present at the place where a crime takes place or is discussed, or even knowing about criminal conduct does not, of itself, make someone a member of the conspiracy or a conspirator." Instruction 21 detailed the type of agreement that must occur for a conspiracy to exist. The third paragraph of the proposed instruction adds little to the quoted language from Instruction 20 and the court's other instructions. The jury had the full panoply of law regarding when a conspiracy exists and when it does not. The court's refusal of the theory of the defense instruction did not preclude the jury from considering the defense's theory.

III. **Motion to Suppress Intercepted Telephone Conversations**

Under the federal wiretap statute, "[a]ny aggrieved person in any trial . . . before any court . . . of the United States . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that . . . the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a). Johnston has standing as an "aggrieved person" under the statute

- 15 -

because he was a party to the intercepted wire communications at issue. Id. § 2510(11). He moved to suppress the intercepted conversations between himself and Jarvis on the basis that the government failed to minimize the interception of privileged attorney-client communications, as required by the Oklahoma state court order authorizing DEA agents to tap Jarvis's phone lines. The district court denied his motion. Johnston appeals that denial.

In reviewing a district court's refusal to suppress wiretap evidence, "we accept the district court's factual findings unless clearly erroneous, review questions of law *de novo*, and view the evidence in the light most favorable to the prevailing party." United States v. Castillo-Garcia, 117 F.3d 1179, 1186 (10th Cir.), cert. denied, 118 S. Ct. 395 (1997). The Oklahoma state court order that authorized the wiretap of Jarvis's phone apparently was issued under Oklahoma's wiretap statute, OKLA. STAT. ANN. tit. 13, § 176.1 et seq. (West 1994). The procedures set forth in the Oklahoma statute are virtually identical to those prescribed by the federal wiretap statute. Compare OKLA. STAT. ANN. tit. 13, § 176.9 with 18 U.S.C. § 2518; see United States v. Edwards, 69 F.3d 419, 429 (10th Cir. 1995), cert. denied, 116 S. Ct. 2497 (1996). Accordingly, we apply federal law in reviewing the admissibility of the intercepted conversations. See United States v. Quintana, 70 F.3d 1167, 1169 (10th Cir. 1995).

The record on appeal does not include a copy of the wiretap order. The

defendant, however, quoted the pertinent provision from it in his brief in support of his motion to suppress, and we assume here that he did so accurately. The order stated that "all wire communications intercepted will be minimized in accordance" with federal and state law, including the minimization of privileged communications. R.O.A. doc. 50, at 4. The defendant asserts that the government violated this order by failing "to do any minimization with regard to Mr. Johnston's conversations with his clients," Appellant's Br. at 46, and therefore the district court should have suppressed those conversations in accordance with 18 U.S.C. § 2518(10)(a)(iii). This argument raises two issues: first, whether the conversations were privileged at all; and second, if they were privileged, whether the government failed to adequately minimize their interception. The district court concluded that the conversations were not privileged because Johnston presented no evidence at the suppression hearing "establishing an attorney-client relationship existing between Johnston and Jarvis at the time of the intercepted calls." United States v. Johnston, No. CR-96-115-L, slip op. at 3 (W.D. Okla. Nov. 8, 1996). Thus, the district court did not reach the second question regarding minimization.

In arguing to uphold the district court's decision to admit the intercepted conversations, the government argues that Johnston cannot assert the attorney-client privilege either on behalf of Jarvis or on his own behalf. The government

correctly points out that the client alone holds the attorney-client privilege, <u>see</u>

<u>Chirac v. Reinicker</u>, 11 Wheat 280, 24 U.S. 280, 293 (1826);1 JOHN W. STRONG

ET AL., MCCORMICK ON EVIDENCE § 92 (Practitioner Ser., 4th ed. 1992), that an

attorney cannot assert it for his own benefit (though he may assert it for a client),

and that the client cannot assert it once he has waived it, <u>see</u> MCCORMICK § 93.

The government mischaracterizes the role the attorney-client privilege plays here,

however. Johnston does not attempt to suppress evidence as privileged attorney-

client communications. Rather, he argues that the conversations should be

excluded because they were taped in violation of the wiretap order. The attorney-

client privilege comes into play because the order specified that the executing

officers should minimize the interception of privileged communications. The

defendant's ability to pursue a motion to suppress under section 2518 is not

impeded by his lack of standing to directly assert the attorney-client privilege.

The issue before us, then, is whether the district court properly found that

no attorney-client relationship existed between Johnston and Jarvis at the time of

the wiretaps, for if no such relationship existed, the conversations were not

privileged, and the government was under no obligation to minimize interception

of the calls. Our review of the record reveals exactly what it revealed to the

district court. No attorney-client relationship existed between Johnston and Jarvis

at the time of the wiretaps.

The defendant argued that the intercepted conversations were privileged attorney-client communications simply because they involved an attorney. However, "the mere fact that an attorney was involved in a communication does not automatically render the communication subject to the attorney-client privilege." Motley v. Marathon Oil Co., 71 F.3d 1547, 1550-51 (10th Cir. 1995), cert. denied, 517 U.S. 1190 (1996). In order to be covered by the attorney-client privilege, a communication between a lawyer and client must relate to legal advice or strategy sought by the client. See id.; In the Matter of Grand Jury Subpoena, 697 F.2d 277, 278 (10th Cir. 1983); see also McCormick § 88 (privilege covers communications where client seeks "professional legal advice"). The defendant does not point us to, nor could the district court uncover, any credible evidence in the record that demonstrates that the conversations related to legal advice or strategy sought by Jarvis.

Johnston also argues that conversations he had with Jarvis regarding representation of certain of Jarvis's relatives were privileged. In those cases, however, the "clients" are Jarvis's relatives, not Jarvis, even if Jarvis paid for the legal representation. See 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 503.11[2] (2d ed. 1998) (noting that for purposes of the attorney-client privilege, the "client" is "the actual recipient of the services").

We also find no merit in the defendant's argument that the conversations were privileged because, rather than demonstrating that he was participating in a drug conspiracy, they show that he was actually providing legal advice to Jarvis regarding how to withdraw from a conspiracy. The district court rejected the argument in denying the motion to suppress, and the jury subsequently rejected it as well when it returned a guilty verdict against the defendant. "The attorney-client privilege does not apply where the client consults an attorney to further a crime or fraud." In re Grand Jury Proceedings, 857 F.2d 710, 712 (10th Cir. 1988) (citing Clark v. United States, 289 U.S. 1 (1933)). The district court did not err in concluding that no attorney-client relationship existed between Johnston and Jarvis at the time of the wiretaps, and it properly denied the defendant's motion to suppress.

## IV.   Sentencing

The defendant raises two specific challenges to his sentence. First, he asserts that the district court improperly sentenced him to one year in prison for attempt to possess the steroid decadurobolin, the count to which he pleaded guilty prior to trial. Defendant's brief raises this argument in a single sentence and without citing any support. Moreover, he did not raise this issue below, so our review is only for plain error. See United States v. Gilkey, 118 F.3d 702, 704 (10th Cir. 1997) (noting that while failure to raise issue below normally precludes

appellate review, narrow exception exists for legal questions involving application of the sentencing guidelines). Under the plain error standard, "the error must be particularly egregious, as well as obvious and substantial." Id. (citations and internal quotation marks omitted). We find no error here.

Because Johnston was convicted of more than one drug count, the district court properly grouped all of the defendant's offenses together for purposes of determining his total punishment. See U.S. SENTENCING GUIDELINES MANUAL §§ 3D1.1 - 3D1.4, 3D1.5 (1995). Under section 3D1.4, the combined offense level determines the length of a defendant's total sentence. In this case, that combined offense level corresponded to a total punishment of 26 months. Under section 5G1.2(b), for each count on which a defendant is convicted, he receives a sentence equal to that total punishment, with each sentence running concurrently. In this case, however, the resulting 26 month sentence for the steroid possession count was higher than the one-year statutory maximum sentence for steroid possession. Accordingly, section 5G1.1(a), through operation of section 5G1.2(b), requires that the statutory maximum be the sentence on that particular count. Therefore, the district court properly calculated the one-year sentence on the steroid conviction.

Second, the defendant argues that the district court improperly based his sentence on a quantity of marijuana that was not reasonably foreseeable. A

defendant who is convicted of participating in a drug conspiracy is accountable "for that drug quantity which was within the scope of the agreement and reasonably foreseeable to her." United States v. Arias-Santos, 39 F.3d 1070, 1078 (10th Cir. 1994). "The sentencing judge's assessment of the drug quantity attributable to a convicted conspirator is a fact finding determined by a preponderance of the evidence which we review for clear error." Id. In computing the defendant's base offense level under the guidelines, the district court held the defendant accountable for 61.8 pounds of marijuana of the total 200 pounds that Alex and Ramone fronted to Jarvis. See United States v. Johnston, No. CR-96-115-L, Order at 3 (W.D. Okla. Apr. 24, 1997). The court arrived at this amount under the following rationale:

> At the time Jarvis contacted defendant, Jarvis indicated that the amount he still owed Alex and Ramone was $34,000.00 out of an original debt of $110,000.00 [for 200 pounds of marijuana].
> The court finds that, prior to October of 1995, there is no evidence that defendant was aware of the specific amount of marijuana involved in the conspiracy. . . . However, the court finds the defendant did have knowledge that at least $34,000.00 worth of marijuana was involved.
> Dividing the original debt of $110,000.00 by 200 pounds of marijuana, the court reaches a per pound price of $550.00. Dividing $34,000.00, the amount known to defendant, by the per pound price of $550.00, the court reaches an amount of 61.8 pounds.

Id. The district court's analysis was exceedingly rational. The court did not err in attributing 61.8 pounds of marijuana to the defendant.

AFFIRMED.