**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 3, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JOSE FRANCISCO DIAZ,

      Defendant-Appellant.

No. 05-2348
(D.C. No. CR-03-2112 MV)
(D. N.M.)

ORDER AND JUDGMENT[*]

Before **BRISCOE**, **McCONNELL**, and **GORSUCH**, Circuit Judges.

A rather remarkable drug trafficking operation employed a series of

commercial tractor trailers to move multi-ton quantities of marijuana from

Mexico and the southwestern United States to the Chicago area from June 2002

through November 2003. Though authorities seized one truck after another,

conspiracy members did not cotton on to the fact that the government had an

informer in their midst. Jose Francisco Diaz, owner of "Stallion Transportation,"

a shady truck leasing company, was associated with a number of the tractor

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 (eff. Dec. 1, 2006) and 10th Cir. R. 32.1 (eff. Jan. 1, 2007).

trailers employed in (and seized full of drugs during) the course of the conspiracy. At trial, a jury convicted Mr. Diaz for his participation, and he received a sentence of 168 months imprisonment. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, 849(a), and 860(a). On appeal, Mr. Diaz professes that he ran a legitimate truck leasing business and had no idea his trucks were transporting narcotics. He also contends that the district court erred in calculating his sentence. We disagree and so affirm.

∗ ∗ ∗

This case began when law enforcement detained Yolanda Alarcon, a commercial truck driver, on her way from El Paso, Texas, to Las Cruces, New Mexico, suspecting that her truck recently had been involved in transporting a load of marijuana. Trial Tr. 706-11. In the course of that encounter, Ms. Alarcon admitted that she was involved in a significant drug trafficking operation and she eventually offered to serve as a paid government informant. An eight-month investigation leading to the arrest of 14 individuals followed.

*The May Seizure*

On May 18, 2003, Ms. Alarcon informed Agent Andrew Armijo of the Federal Bureau of Investigation ("FBI") that a member of her drug trafficking operation, Edgar Lopez-Hernandez, had asked her to move a purple tractor trailer (the "purple trailer") for him and Jorge Torres-Laranega to stash houses within Las Cruces, New Mexico, in order to fill the truck with drugs for its eventual

- 2 -

journey to Chicago. Trial Tr. 156, 723-28. After Ms. Alarcon completed her assigned task, another member of the conspiracy, Mr. Martin Mendivil, proceeded to drive the purple trailer north. At a permanent United States Border Patrol checkpoint on Interstate 25, approximately 20 miles outside of Las Cruces, New Mexico, the truck was searched and 1,417 kilograms of marijuana were seized. *Id.* at 167, 239.

Agent Jacinto Flores, a special agent with the Drug Enforcement Administration ("DEA"), subsequently inspected the tractor trailer and discovered a black binder containing insurance cards, the vehicle registration, and a New Mexico Public Regulation Commission (the "Commission") registration receipt. *Id.* at 246-48, 252. The insurer of the purple trailer was also listed as Stallion Transportation with a business address identified as a post office box in Sunland Park, New Mexico. *Id.* at 248-49. The Commission had on file two business addresses for Stallion Transportation, both of which principally listed Jose F. Diaz in the address. *Id.* at 253. In late May 2003, Agent Flores attempted to contact Mr. Diaz but discovered that the addresses provided to the Commission were phony. *Id.* at 254.

Remarkably, Mr. Diaz's attorney contacted Agent Flores in an effort to retrieve the purple trailer. *Id.* at 255. On or about June 6, 2003, Mr. Diaz's attorney faxed to Agent Flores the vehicle registration and title indicating that the truck was registered to Jose F. Diaz and owned by Stallion Transportation. *Id.* at

- 3 -

256-58, 308. A couple weeks later, Mr. Diaz and his attorney met with DEA agents in a further effort to retrieve the vehicle. *Id.* at 258. Mr. Diaz provided a written lease to Agent Flores representing that Mr. Diaz leased the purple trailer in the first week of May 2003 to a Jorge Reyes. *Id.* at 259. The lease agreement, however, contained several irregularities, *viz.*, it did not meaningfully identify the trailer to be leased (no vehicle identification number, license plate number, make, or model was listed), and the lease term stated it was for three months even though the contract start and end dates spanned four months. Ex. 152. The lease was purportedly notarized by Lorena Garcia, a notary licensed in the State of Texas. *Id.* However, Ms. Garcia testified at trial that the signature on the document was not hers, she had never seen the document previously, and she did not know how her stamp became imprinted on the document. Trial Tr. 609-10. Mr. Diaz also provided the DEA with yet another business address for Stallion Transportation which the DEA subsequently discovered was also a sham. *Id.* at 284-85.

*The July Seizure*

In early July, Ms. Alarcon informed Agent Armijo that Mr. Torres-Laranega had asked her to drive another tractor trailer from Chicago to Laredo, Texas, so that it could be packed with marijuana for a return trip to Chicago. *Id.* at 753. The tractor trailer – this time white and blue (the "white trailer") – was also leased by Mr. Diaz's Stallion Trucking company. *Id.* at 801-03. When the

truck stopped for gas in Indiana, a police officer with the Chicago Police Department approached Jose Barraza, the driver, and requested, and received, permission to search the white trailer. *Id.* at 1399-1400, 1403. During the search, the officer uncovered about 681 kilograms of marijuana. *Id*. at 1407-08. Officers also uncovered a black file folder in the cab of the white trailer which contained a lease agreement, dated May 21, 2003, between Steven Broussard and Jose F. Diaz d/b/a Stallion Transportation. *Id.* at 1461, 1464; Ex. 785. The lease agreement stated that Jose F. Diaz was to provide the "commodities" being transported. Ex. 785.

Several days after the truck was impounded, Mr. Barraza retrieved the truck from the Gary Police Department in Gary, Indiana. *Id.* at 1550-54. He presented an insurance identification card issued to Stallion Transportation, and a letter from Broussard Carriers purportedly notarized by Scott Kinney which requested release of the white trailer to Mr. Barazza and gave Mr. Barraza permission to drive the white trailer. *Id.*; Ex. 806. Mr. Kinney testified at trial that neither the notary stamp nor the signature on the Broussard letter was his – both were forgeries. Trial Tr. at 1716-18.

Undeterred by the government's repeated seizures, Mr. Torres-Laranega instructed Ms. Alarcon to register yet another tractor trailer under Ms. Alarcon's name. Trial Tr. 812-13. If asked for a reference, Mr. Torres-Laranega told Ms. Alarcon to use Joe Diaz at Stallion Transportation and, in fact, Mr. Diaz

subsequently had a conversation with the truck registration company regarding Ms. Alarcon.  *Id.* at 829-30.

*The August and September Seizures*

In August 2003, Ms. Alarcon met Mr. Diaz, Mr. Torres-Laranega, and others in order to repair still another tractor-trailer (this time, a grey Freightliner) purchased for still another drug run.  *Id.* at 864-68.  On August 6, 2003, a New Mexico Police Officer photographed Mr. Diaz and Mr. Torres-Laranega attempting to jump start the engine of the grey Freightliner.  *Id.* at 1989-92, 1995-97.  On that same day, two phone calls were intercepted between various members of the cell discussing delivery and unloading operations at a stash house in El Paso, Texas.  Ex. 381; 388.  In one of these conversations Mr. Torres-Laranega remarked, "Joe already went to pick up the big truck."  Ex. 381.  On the following day, August 7, 2003, 523 kilograms of marijuana were found in the stash house after the police received an anonymous tip.  *Id.* at 1912-13, 1926. One of the individuals detained while fleeing the residence, Raul Espinoza, participated in the phone call intercepted the day prior in which "Joe" was mentioned.  *Id.* at 1769-70; Ex. 381.

On September 9, 2003, Mr. Torres-Laranega instructed Ms. Alarcon to drive the grey Freightliner from Las Cruces to El Paso to pick up drugs for yet another journey to Chicago.  *Id.* at 878-81.  The following day, Ms. Alarcon did just that.  *Id.* at 883; *see also id.* at 2011.  Upon arriving at a Love's Truck Stop

- 6 -

in El Paso, Texas, Ms. Alarcon was met by two of her colleagues in the trafficking ring. *Id.* at 883-84. Following Mr. Torres-Laranega's direction that Mr. Diaz would coordinate travel arrangements for Ms. Alarcon and her companions in and around El Paso, the three of them left the truck stop together in Mr. Diaz's personal truck. Ex. 510. Subsequently, FBI agents observed another member of the conspiracy drive the grey Freightliner to a warehouse in El Paso and back it into a loading dock. *Id.* at 1970-71. The warehouse was located near railroad tracks, a refinery, and Interstate 10. *Id.* at 1980-81.

The FBI recorded two calls that day involving Mr. Diaz. The first was between two members of the conspiracy who referred to Mr. Diaz and described Cesar Miramontes, another member of the conspiracy, as "the one who hangs around with Joe." Ex. 505 at 3. Another conversation between Mr. Diaz and Mr. Miramontes shows Mr. Diaz speaking in code and asking Mr. Miramontes about the grey Freightliner, its location and security, and whether the drugs had been loaded – to which Mr. Miramontes responded, "UPS has stopped . . . by there to deliver and all that." Ex. 507 at 3.

Two days later, the grey Freightliner was searched in El Paso and found carrying a total of 2,340 kilograms of marijuana. *See Id.* at 2017, 2078-79. Incredibly, even after this fourth seizure, Mr. Torres-Laranega was apparently not aware of the government's investigation and instructed Ms. Alarcon to register and insure another tractor trailer in her name to transport narcotics. *Id.* at 920-21.

Mr. Torres-Laranega then arranged a meeting between Mr. Diaz and Ms. Alarcon where Mr. Diaz supplied Ms. Alarcon with keys to a new truck.  *Id.* at 921-22.

*The Arrest*

Authorities arrested Mr. Diaz and Mr. Miramontes in El Paso, Texas, in November 2003.  Trial Tr. 2211, 2213-14.  During a search of Mr. Miramontes's vehicle, the FBI uncovered a binder containing several documents bearing the name "Jose F. Diaz" including an agreement specifying an interest rate for a 2000 Cadillac Escalade; a tractor trailer rental agreement, dated October 13, 2003, between Joe Diaz and Jorge L. Reyes, purportedly notarized by Lorena Garcia; a lease of motor vehicle equipment between Jose F. Diaz d/b/a Stallion Transportation and Steven Broussard d/b/a Broussard Carriers for the period beginning May 21, 2003, and ending November 21, 2003; a purchaser's statement and a retail installment contract for a Columbus Trucking tractor trailer under Mr. Diaz's name; and a security agreement describing Jose F. Diaz as the purchaser of a used Freightliner for $89,527.35.  *Id.* at 2135-43.

At a search of Mr. Torres-Laranega's home the same day, the FBI found still more documents relating to Mr. Diaz and Stallion Transportation, including an insurance certification card issued to Stallion Transportation; a lease agreement, commencing May 21, 2003, between Jose Diaz d/b/a Stallion Transportation and Steven Broussard d/b/a Broussard Carriers; New Mexico

taxation documents for Broussard Carriers; and a letter from the U.S. Department of Transportation, dated July 19, 2002, addressed to Jose Diaz. *Id*. at 2237-43.

Perhaps unsurprisingly, the Internal Revenue Service has no record of any tax filings for Jose F. Diaz, his social security number, or Stallion Transportation for the years 2001, 2002, or 2003. *Id*. at 1656-57.

＊ ＊ ＊

*Sufficiency of the Evidence Challenge*

We review challenges to the sufficiency of the evidence *de novo*, asking whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt based on the evidence presented. *United States v. Rockey*, 449 F.3d 1099, 1102 (10th Cir. 2006). Out of respect for the jury's verdict, we are obliged to review the evidence, together with all reasonable inferences that might be drawn therefrom, in the light most favorable to the government. *United States v. Chavis*, 461 F.3d 1201, 1207 (10th Cir. 2006). The evidence "need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt. Instead, the evidence only has to reasonably support the jury's finding of guilt beyond a reasonable doubt." *United States v. Wilson*, 182 F.3d 737, 742 (10th Cir. 1999) (internal citations and quotations omitted).

To prove its charge, the government had to establish that Mr. Diaz (1) agreed with two or more persons to import and possess with intent to distribute 1,000 kilograms or more of marijuana, (2) knew at least the essential objectives of

the conspiracy, (3) knowingly and voluntarily became part of the conspiracy, and (4) was interdependent on other co-conspirators. *See United States v. Arras*, 373 F.3d 1071, 1074 (10th Cir. 2004); 21 U.S.C. § 846. In a conspiracy case, moreover, "the government must prove guilty knowledge: an implicit or explicit agreement to enter into a known conspiracy with a known objective." *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995). That said, a jury is free to infer an agreement to pursue an unlawful objective from the acts of the parties and other circumstantial evidence; it may presume that a defendant is a knowing participant in the conspiracy when he or she acts in furtherance of the objective of the conspiracy. *United States v. Johnston*, 146 F.3d 785, 789 (10th Cir. 1998).

Mr. Diaz concedes that his business practices – including the accuracy and legality of his business documents – were less than commendable. But, he argues, there is no evidence indicating that he knew, much less agreed, that the object of the conspiracy was to transport marijuana (Mr. Diaz's counsel suggested at oral argument that Mr. Diaz could have believed, for example, that the illicit activity was trafficking illegal aliens). We find this suggestion unpersuasive. From the facts recited above, a reasonable jury easily could have concluded that Mr. Diaz's Stallion Transportation was not only a sham business involved in illegal activity but also that Mr. Diaz knew marijuana distribution was the plan.

After all, Mr. Diaz picked up the purple trailer from the DEA in early June 2003 with full notice it had been used by Mr. Torres-Laranega's operation for

transporting drugs, yet he continued to do business with Mr. Torres-Laranega.

Indeed, none of the three subsequent seizures deterred him from continuing to

pursue this line of business. Mr. Diaz was also the person designated to provide

the "commodities" to be transported in the white trailer. He helped to coordinate

the travel of each of the truckloads seized in one fashion or another. And, a jury

could easily have concluded that Mr. Diaz's coded conversation on September 10,

2003, suggested that he knew precisely the object of the conspiracy. Even

counsel for Mr. Diaz conceded at oral argument that it would be reasonable for a

jury to conclude that the participants on the September 10 call using coded terms

knew the object of the conspiracy, suggesting only that the "Joe" on the call was

more likely Jose Barraza than Jose Diaz. However, Mario Garcia, a language

specialist with the FBI, testified that based on his training, experience and

methodology, he is able to identify speakers based on speech patterns particular to

individuals, and a host of other factors. Trial Tr. 434-36. Mr. Garcia separately

identified Mr. Diaz and Mr. Barraza based on their different "vocal fingerprints,"

*id.* at 437, 439, and identified Mr. Diaz as the "Joe" participating in the

September 10 call. *Id.* at 428, 461-62. Taken in the light most favorable to the

government, this evidence is sufficient to establish that Mr. Diaz was the speaker

and knew the object of the conspiracy. *See, e.g., United States v. Earls*, 42 F.3d

1321, 1324 (10th Cir. 1994) (holding that recorded conversations in which

defendant spoke in code in conjunction with expert testimony explaining the code

- 11 -

terms sufficient to find the defendant a co-conspirator in a methamphetamine distribution conspiracy); *compare Jones*, 44 F.3d at 865-66 (finding evidence insufficient to support defendant conspired to distribute cocaine where defendant was merely a passenger in a vehicle transporting cocaine, no cocaine was found in her personal effects, and all other conspirators were linked through pen registers demonstrating frequent communication with a known drug dealer); *United States v. Austin*, 786 F.2d 986, 988-89 (10th Cir. 1986) (the defendant's sale of his ranch to strangers who subsequently used the ranch to transport marijuana, and the defendant's later suspicions that the ranch may have been used for illegal activity, were insufficient for a rational fact finder to infer that defendant knew the object of the conspiracy was the distribution of marijuana).[1]

## Sentencing Challenges

Mr. Diaz cites two supposed errors in his sentencing, but raises each for the first time on appeal. Given the absence of a contemporaneous objection bringing these issues to the trial court's attention, we are constrained to review Mr. Diaz's sentence only for plain error. *United States v. Johnson*, 414 F.3d 1260, 1263

---

[1] Mr. Diaz's additional sufficiency of the evidence argument, that he was not interdependent on other co-conspirators, is also unavailing. A reasonable jury could well have found that Mr. Torres-Laranega relied upon Mr. Diaz to coordinate many of the transportation arrangements for the marijuana deliveries and that Mr. Diaz, *inter alia*, supplied two trailers to the organization, gave Ms. Alarcon keys to another trailer, coordinated transportation with members of the conspiracy, repaired a refrigerated trailer, and served as a job reference for Ms. Alarcon.

(10th Cir. 2005) (defendant "must show that the district court (1) committed error, (2) that the error was plain, and (3) that the plain error affected his substantial rights").  Neither of his claimed errors comes close to satisfying this standard.

First, Mr. Diaz contends that the district court erred in calculating his sentence because "there was insufficient evidence to establish that Diaz could foresee that *any* amount of marijuana would be transported by others in his trucks. Accordingly, no amount of marijuana may be attributed to Diaz."  Appellant's Br. at 12.  This, however, is less a challenge to his sentence than a retread of his sufficiency of the evidence argument, suggesting again that Mr. Diaz had no knowledge that *any* drugs were involved, and it is no more persuasive.

Alternatively, Mr. Diaz argues that only the amounts seized in the May 2003 and July 2003 seizures in which his trucks were used to transport marijuana are reasonably attributable to him.  Appellant's Br. at 13.  There was, however, ample evidence connecting Mr. Diaz to each and every one of the four seizures, *see supra* at 2-9, and we are thus constrained to conclude that the entire amount seized by the government was within the scope of the agreement and reasonably foreseeable to Mr. Diaz.  *See Johnston*, 146 F.3d at 795 (a defendant "participating in a drug conspiracy is accountable for that drug quantity which

was within the scope of the agreement and reasonably foreseeable to [him]"

(internal quotation omitted)).[2]

＊ ＊ ＊

Mr. Diaz's conviction and sentence are AFFIRMED.

ENTERED FOR THE COURT


Neil M. Gorsuch
Circuit Judge

---

[2]Although not raised by Mr. Diaz on appeal, nor addressed by the government, we note an apparent discrepancy regarding the total amount of marijuana seized. The government's brief suggests that the amount was 4,961 kilograms. *See* Appellee's Br. at 39 (stating "5,316 kilograms" but providing quantities that add up to 4,961 kilograms). Meanwhile, the presentence report ("PSR") listed the sum as 5,316.6 kilograms. PSR at 12. Even if there were some computational error, however, any such error would not have affected Mr. Diaz's substantial rights and, thus, does not rise to the level of plain error. So long as the amount seized is between 3,000 and 10,000 kilograms, the base offense level under the statutory guidelines is the same. *See* U.S.S.G. § 2D1.1(c)(2) (Nov. 2004).