FILED
United States Court of Appeals
Tenth Circuit

November 5, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

CLIVE ANTHONY HAMILTON,

Defendant-Appellant.

No. 07-3273

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 02-CR-40157-03-JAR)**

---

Melanie S. Morgan of Morgan Pilate LLC, Olathe, Kansas, for Defendant-Appellant.

Anthony W. Mattivi, Assistant United States Attorney (Eric F. Melgren, United States Attorney; James A. Brown, Assistant United States Attorney, on the brief), Topeka, Kansas, for Plaintiff-Appellee.

---

Before **HARTZ**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **HOLMES**, Circuit Judge.

---

**HOLMES**, Circuit Judge.

---

Defendant-Appellant Clive Anthony Hamilton appeals his jury conviction and

360-month sentence for conspiracy to distribute marijuana, in violation of 21 U.S.C. §

846.  Mr. Hamilton challenges his conviction on several grounds, asserting (1) that there

was insufficient evidence to establish venue in Kansas because he was not a member of the drug trafficking conspiracy that had its drugs seized by law enforcement in Kansas, (2) that evidence should have been suppressed because of *Miranda* violations and because it arose from an arrest without probable cause, and (3) that a witness's reference at trial to Mr. Hamilton's postarrest silence required a mistrial. He also challenges his sentence, arguing that the base offense level was determined using the wrong drug quantity and that the evidence did not support a leadership role enhancement. Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we **AFFIRM**.

## I. BACKGROUND

On December 23, 2002, Drug Enforcement Agency ("DEA") agents investigated a suspicious charter flight that was refueling in Salina, Kansas, and found 564 pounds of marijuana. One of the passengers whom they arrested was Troy Barker, who was later identified as a leader of a drug distribution network based in Los Angeles, California, that supplied marijuana to Cleveland, Ohio. Mr. Barker contacted family members to help secure a lawyer.

Early the next day, Mr. Hamilton and Brian Diaz, both half brothers of Mr. Barker, and Sean Gayle, one of Mr. Barker's associates who was familiar with the Cleveland drug operation, chartered a flight from the Van Nuys Airport outside Los Angeles to Cleveland. In Cleveland, they acquired a suitcase that was filled with money from various sources. Then they took their chartered jet back to the Van Nuys Airport.

When they arrived at the airport, they were confronted by four police officers. A

2

vehicle had been reported stolen by Dean Dormer, who later became a codefendant in this case. It was discovered at the airport using global-positioning-system technology and was one of the two vehicles that the men had left parked at the airport during their trip. When the officers called the purported owners of the vehicle, who had reported it stolen, to explain that it had been found, the owners changed their story several times, claiming that it was merely a business dispute and that they only wanted to reclaim the vehicle. Their suspicion raised, the officers decided to wait for the return of the charter jet.

After Mr. Hamilton, Mr. Diaz, and Mr. Gayle deplaned, they walked toward the vehicles. Mr. Hamilton was pulling a large stroller suitcase. He approached the driver's side door of the "stolen" vehicle. One of the officers asked who owned the vehicle, and Mr. Diaz replied that it was his. Mr. Diaz denied that the vehicle was stolen; he said that he had been making payments on the vehicle for quite some time and that he knew the registered owner but had not had contact with him for six months. During this conversation, one of the officers—the supervising police sergeant—noticed Mr. Hamilton walking toward the rear of one of the vehicles as if "trying to avoid the police," so the sergeant drew his firearm and ordered Mr. Hamilton to get back with the others. Aplt. App. at 415. Because the men were behaving nervously and moving their hands to their pockets, the sergeant ordered them to be handcuffed.

The sergeant began questioning Mr. Hamilton and noticed a strong odor of marijuana on his clothing. When asked if he had any marijuana on him, Mr. Hamilton replied that he had smoked some on the jet. The sergeant pressed him further, saying, "I

3

know you have dope on you. Where's your dope?" Aplt. App. at 1568. Mr. Hamilton stated that it was in his shoulder bag, and he said "yes" when asked if the officer could open the bag. The sergeant opened the bag, found a baggie of marijuana, and placed Mr. Hamilton under arrest. After arresting him, the sergeant asked who owned the suitcase, and Mr. Hamilton said it was his and that it contained tapes. At this point, the sergeant read the *Miranda* warnings to Mr. Hamilton, who asked for a lawyer and refused to speak further. The sergeant opened the suitcase and discovered a large amount of cash, which was later confirmed to be $852,405. The officers also found a firearm on the person of each of the men.

When investigators obtained a copy of the charter flight invoice, they found that it was billed to Individual Records and to Heartless Records, Inc. This fact allowed them to connect the December 23, 2002, seizure in Kansas and the December 24, 2002, seizure in California because Mr. Hamilton was the president of Individual Records and Mr. Barker was the president of Heartless Records. The government ultimately indicted ten individuals in the U.S. District Court for the District of Kansas for conspiracy to distribute more than 1000 kilograms of marijuana between 1994 and 2003, in violation of 21 U.S.C. § 846, with reference to the substantive offenses set out in 21 U.S.C. § 841(a)(1) and (b)(1)(A). In addition to Mr. Hamilton, the government charged Mr. Barker, Mr. Diaz, Mr. Gayle, Faith[1] and Mitchell Hamilton (the half sisters of Mr. Barker

---

[1] The indictment notes that Faith Hamilton is also known under a different spelling of her first name: "Faeth." This alternative spelling appears in the government's

(continued...)

4

and Mr. Diaz, and full sisters of Mr. Hamilton), Clarence Adolphus (an associate of Mr. Barker's who owned a flight chartering company), Mr. Dormer (an associate of Mr. Barker's who owned the "stolen" vehicle), and two other individuals not relevant here. In exchange for concessions from the government, Mr. Diaz and Mitchell Hamilton agreed to testify against Mr. Hamilton, as did Melanie Adauto, an unindicted coconspirator who was the mother of Mr. Hamilton's three children.

Mr. Hamilton was tried jointly with Mr. Dormer, and after a seven-day trial and several days of deliberation, the jury found both men guilty. Using a special verdict form, the jury found that Mr. Hamilton conspired to distribute 1000 kilograms or more of marijuana. At the sentencing hearing, the district court employed a base offense level of thirty-four pursuant to U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 2D1.1(c)(3) for an offense involving at least 3000 kilograms of marijuana.[2] The district court applied two enhancements: specifically, a two-level enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a dangerous weapon, and a four-level enhancement under U.S.S.G. § 3B1.1(a) for a leadership role in a criminal activity that involved five or more participants. The adjusted offense level of forty, along with a criminal history category of

---

[1](...continued)
appellate brief and in the transcript of proceedings before the district court. However, Mr. Hamilton's spelling of his sister's first name in his appellate brief is consistent with the charges of the indictment (i.e., "Faith") and that is the spelling that we use here.

[2]    Mr. Hamilton's sentence was computed by referencing the 2005 edition of the United States Sentencing Guidelines Manual. The parties do not question the use of that edition. Accordingly, we use that edition in our analysis and our citations to the Guidelines are to the 2005 edition.

III, yielded a Guidelines imprisonment range of 360 months to life. The district court sentenced Mr. Hamilton to 360 months' imprisonment and five years of supervised release. Mr. Hamilton timely filed a notice of appeal.

## II.  DISCUSSION

### A.    Sufficiency of the Evidence:  Venue

Mr. Hamilton's first argument on appeal is that venue for his trial was not proper in Kansas because there was insufficient evidence at trial to support the indictment's charge that he was a member of a conspiracy that acted "in the District of Kansas and elsewhere." Aplt. App. at 2.  He argues that this is a fatal variance which requires reversal of his conviction. *See, e.g., United States Windrix,* 405 F.3d 1146, 1154 (10th Cir. 2005) (discussing variances and noting that "[e]ven if there was a variance" it would not be "a ground for reversing" convictions, if "it was not substantially prejudicial to Defendants").  He first raised the venue issue in pretrial motions, and pressed this argument at the close of the government's evidence in a Federal Rule of Criminal Procedure 29(a) motion for judgment of acquittal, and renewed it in a Rule 29(c) motion after the verdict.  The district court rejected the Rule 29(a) motion in an extensive ruling from the bench and later relied on that ruling in rejecting the Rule 29(c) motion at the sentencing hearing.

We review de novo the district court's denial of the Rule 29 motions.[3] *See United*

---

[3]    Mr. Hamilton endorses the legal proposition that "[a]n appellant who asserts the existence of a fatal variance between the indictment and the proof at trial

(continued...)

6

*States v. Vigil*, 523 F.3d 1258, 1262 (10th Cir.) ("We review the sufficiency of the

evidence to support a jury's verdict and the denial of [defendant's] motion for judgment

of acquittal de novo."), *cert. denied*, 129 S. Ct. 281 (2008). As he frames the issue, Mr.

Hamilton's ultimate challenge is to the sufficiency of the evidence to establish venue.

Although venue is not a substantive element of a narcotics crime, it must be proved in

every criminal case. *See, e.g.*, *United States v. Kelly*, 535 F.3d 1229, 1233 (10th Cir.

2008) ("Although venue is not the focal point in most criminal matters, it is not a mere

technicality. It is a constitutional consideration and an element of every crime." (citations

and internal quotation marks omitted)), *cert. denied*, 129 S. Ct. 1392 (2009). The success

of Mr. Hamilton's venue challenge, however, depends upon the success of a tandem

attack on the sufficiency of the evidence to support his conviction for the charged

narcotics conspiracy. Ordinarily, we determine whether a rational jury could find the

---

[3](...continued)
essentially challenges the sufficiency of the evidence by questioning whether the evidence established a single conspiracy." Aplt. Br. at 26. The standard of review in assessing the sufficiency of the evidence is de novo. To be sure, we have noted that the form that a fatal variance argument takes can lead to the application of a different standard of review. *See United States v. Sells*, 477 F.3d 1226, 1236-37 & n.13 (10th Cir. 2007) (noting that although a fatal variance argument is generally reviewed de novo, the argument was raised in the form of a motion for a mistrial, which is reviewed for abuse of discretion (citing *United States v. Caballero*, 277 F.3d 1235, 1242 (10th Cir. 2002))). However, on these facts, Mr. Hamilton employed Rule 29 in advancing his sufficiency-of-the-evidence argument. We will likewise use the framework of Rule 29, applying a de novo standard of review, in determining whether, as to Mr. Hamilton, there was sufficient evidence to establish the legal propriety of venue in the District of Kansas.

defendant guilty of the charged conspiracy beyond a reasonable doubt,[4] viewing both the evidence and reasonable inferences to be drawn from the evidence in the light most favorable to the government. *Id.* at 1232-33. "In so doing, we do not weigh evidence or credibility; we ask instead only whether the government's evidence, credited as true, suffices to establish the elements of the crime." *United States v. Hutchinson*, 573 F.3d 1011, 1033 (10th Cir. 2009), *petition for cert. filed*, __ U.S.L.W. __ (U.S. Oct. 22, 2009) (No. 09-7201).

"The essence of a drug distribution conspiracy is an agreement between two or more persons to traffic in controlled substances." *United States v. Horn*, 946 F.2d 738, 740 (10th Cir. 1991). To prove such a conspiracy the government must show that (1) two or more persons agreed to violate the drug laws; (2) the defendant knew the essential objectives of the conspiracy; (3) the defendant knowingly and voluntarily participated in the conspiracy; and (4) the conspirators were interdependent. *See, e.g.*, *United States v. Wright*, 506 F.3d 1293, 1297-98 (10th Cir. 2007). "A defendant's participation in a

---

[4] We recognize that the government's burden of proof to establish venue (a non-substantive element of the offense) is lower than beyond a reasonable doubt—*viz.*, a preponderance of the evidence. *See, e.g.*, *United States v. Byrne*, 171 F.3d 1231, 1234 (10th Cir. 1999) ("[W]hen the motion raises a question of venue, we alter the analysis somewhat, for unlike other substantive elements of the offense charged, the government need only prove venue by a preponderance of the evidence."). This raises a question as to whether the sufficiency of the proof of the elements of the narcotics offense at issue still should be judged by the beyond-a-reasonable-doubt standard, because the ultimate question (as framed by Mr. Hamilton) is one of venue, which is governed by the lower, preponderance standard. We need not answer that question in this case. Even giving Mr. Hamilton the benefit of the higher burden of proof (i.e., beyond a reasonable doubt), we ultimately conclude that Mr. Hamilton's venue argument fails.

conspiracy is proven by evidence tending to show that the defendant shared a common purpose or design with his alleged coconspirators." *United States v. Slater*, 971 F.2d 626, 630 (10th Cir. 1992) (per curiam). "But we have recognized that '[b]ecause a criminal conspiracy by its very nature is usually shrouded in a further conspiracy of silence, the common plan or purpose must often be, and may legitimately be, proved by circumstantial evidence.'" *Hutchinson*, 573 F.3d at 1035 (alteration in original) (quoting *United States v. Robertson*, 45 F.3d 1423, 1442 (10th Cir. 1995)).

"We are mindful to guard against the mass application of guilt when conspiracy charges are involved because guilt is always dependent on personal and individual conduct, not on mere association or unknowing involvement." *Horn*, 946 F.2d at 741. "[A]s we have repeatedly emphasized in our decisions in this area, we cannot sustain a conspiracy conviction if the evidence does no more than create a suspicion of guilt or amounts to a conviction resulting from piling inference on top of inference." *United States v. Hernandez*, 509 F.3d 1290, 1295 (10th Cir. 2007) (internal quotation marks omitted). "[O]ne [does not] become a member of a conspiracy merely by associating with conspirators known to be involved in crime." *Slater*, 971 F.2d at 630. However, "[t]he connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt." *United States v. Tranakos*, 911 F.2d 1422, 1430 (10th Cir. 1990) (internal quotation marks omitted). "Even a single overt act by the defendant can be sufficient to connect him to the conspiracy if that act leads to a reasonable inference of intent to participate in an

9

unlawful agreement or criminal enterprise." *United States v. Pack*, 773 F.2d 261, 266 (10th Cir. 1985).

Mr. Hamilton predicates his venue argument on an alleged failure of proof as to the charged drug conspiracy, focusing on the fourth element—that is, interdependence. According to Mr. Hamilton, the government's alleged failure of proof concerning the interdependence element results in a variance and that variance was impermissibly prejudicial because its effect was to negate the evidentiary foundation for the court's venue as to him. Mr. Hamilton concedes that venue for the charged drug conspiracy is proper in any jurisdiction where an overt act in furtherance of a conspiracy was committed by any of the conspirators, even if the defendant-conspirator has never been to that jurisdiction. *See United States v. Miller*, 111 F.3d 747, 753 n.8 (10th Cir. 1997) ("In a drug conspiracy case, venue for a defendant lies either in the jurisdiction in which the conspiratorial agreement was formed or in any jurisdiction in which an overt act in furtherance of the conspiracy was committed by any of the conspirators." (internal quotation marks omitted)); *see also United States v. Magleby*, 420 F.3d 1136, 1145 (10th Cir. 2005) (noting that "venue is proper wherever acts in furtherance of the conspiracy occur, regardless of whether an overt act must be proved" as a requisite element of the conspiracy offense); *United States v. Andrus*, 775 F.2d 825, 846 (7th Cir. 1985) (rejecting argument that "because proof of an overt act is unnecessary to this [narcotics] conspiracy conviction, venue cannot be based upon the occurrence of overt acts within the district" (citation omitted)).

Generally speaking, a defendant who joins an ongoing conspiracy may be held

accountable—for purposes of determining the scope of liability for the conspiracy charge

itself—with the acts or statements of coconspirators that occurred prior to his entry into

the conspiracy, if those acts or statements were in furtherance of the conspiracy.[5] *See*

*United States v. Coleman*, 7 F.3d 1500, 1503 (10th Cir. 1993) ("It is fundamental that a

party may join an ongoing conspiracy during its progress and become criminally liable

for all acts done in furtherance of the scheme." (internal quotation marks omitted));

*United States v. Blackthorne*, 378 F.3d 449, 454 (5th Cir. 2004) ("[O]ne who joins an

ongoing conspiracy is deemed to have adopted the prior acts and declarations of

conspirators, made after the formation and in furtherance of the conspiracy." (internal

quotation marks omitted)); *United States v. David*, 940 F.2d 722, 735 (1st Cir. 1991)

("When, as here, a miscreant opts to join an ongoing conspiracy, the law holds him

accountable for the earlier acts of his coconspirators in furtherance of the conspiracy.").

---

[5]     Although we have no occasion to address the point here since Mr. Hamilton is charged only with the conspiracy offense, such a defendant cannot be held liable for *substantive crimes* committed by coconspirators prior to his entry in the conspiracy. *See Glazerman v. United States*, 421 F.2d 547, 551 (10th Cir. 1970) (noting that "an individual cannot be held criminally liable for substantive offenses committed by members of the conspiracy before that individual had joined or after he had withdrawn from the conspiracy"); *see also United States v. Blackmon*, 839 F.2d 900, 908-09 (2d Cir. 1988) ("[A]s to liability for *conspiracy*, a defendant may be legally responsible for acts of coconspirators prior to that defendant's entry into the conspiracy, while as to liability for *substantive offenses*, a defendant cannot be retroactively liable for offenses committed prior to his joining the conspiracy." (citation omitted)); *cf. Levine v. United States*, 383 U.S. 265, 266 (1966) (per curiam) (vacating certain substantive-offense convictions of conspirators where Solicitor General "conced[ed] that an individual cannot be held criminally liable for substantive offenses committed by members of the conspiracy before that individual had joined or after he had withdrawn from the conspiracy").

11

We discern no reason why this principle does not apply to the prior overt acts of coconspirators that establish the basis for venue and so hold. *See United States v. Davis*, 666 F.2d 195, 200 (Former 5th Cir. 1982) (rejecting defendant's argument that "she was improperly tried in Georgia because the government did not prove that she joined the conspiracy before [her coconspirator and an undercover agent] arrived in Florida," stating that "[s]ince the prior actions of coconspirators in furtherance of the conspiracy are attributable to one who later joins the conspiracy," that conduct of a coconspirator involving the Georgia trial district, although *predating* her entry into the conspiracy, was "attributable" to her).

Mr. Hamilton does not dispute that Mr. Barker committed an overt act in furtherance of the charged conspiracy in Kansas. In essence, however, Mr. Hamilton's position is that the evidence at trial was insufficient to establish that his actions were interdependent with Mr. Barker's conspiracy. Consequently, reasons Mr. Hamilton, the evidence was insufficient to prove that he was a member of Mr. Barker's conspiracy. Thus, according to Mr. Hamilton, Mr. Barker's presence in Kansas is irrelevant to whether Mr. Hamilton could be properly tried in Kansas for the charged conspiracy. Specifically, Mr. Hamilton argues that he was not a member of the single, multiyear conspiracy charged in the indictment, asserting that trial evidence showed he entered "a separate conspiracy . . . formed for the narrow purpose of collecting drug debts owed to Barker by individuals in Cleveland" and that "[b]ecause there were two separate conspiracies, Hamilton is not responsible for Barker[']s possession of marijuana in

12

Kansas." Aplt. Br. at 32. Consequently, according to Mr. Hamilton, the trial evidence varied from the charged crime and impermissibly prejudiced him by effectively rendering the trial court an impermissible venue. However, we agree with the district court that Mr. Hamilton's conduct was interdependent with the conduct of members of Mr. Barker's drug conspiracy. Under the circumstances here, we therefore conclude that Mr. Hamilton entered Mr. Barker's conspiracy, that there was no variance from the indictment, and that venue was proper in Kansas.

When a defendant challenges the government's assertion of a single conspiracy, "a focal point of the analysis is whether the alleged coconspirators' conduct exhibited interdependence." *United States v. Edwards*, 69 F.3d 419, 432 (10th Cir. 1995). It requires "proof that the conspirators intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged." *United States v. Heckard*, 238 F.3d 1222, 1231 (10th Cir. 2001) (alterations and internal quotation marks omitted). The requirement is satisfied "if the alleged coconspirators were united in a common unlawful goal or purpose and if a defendant's activities facilitated the endeavors of *another alleged coconspirator or facilitated the venture as a whole*." *United States v. Ailsworth*, 138 F.3d 843, 851 (10th Cir. 1998) (citation and internal quotation marks omitted) (emphasis added); *see Hutchinson*, 573 F.3d at 1036.

Mr. Hamilton argues that his "one-time agreement to assist in a one-time collection of money" does not constitute "rejoin[ing] the pre-existing conspiracy for the common purpose of distributing marijuana." Aplt. Br. at 28. Most significantly, he

13

asserts that interdependence is disproved by evidence that he left Mr. Barker's conspiracy between 1995 and 1997, and also by his failure to profit from his role in the alleged conspiracy. For purposes of this appeal, we accept Mr. Hamilton's position that the evidence shows that he left Mr. Barker's organization in the mid-1990s and established a separate marijuana distribution organization. However, we conclude that there was sufficient evidence for a rational jury to conclude that Mr. Hamilton rejoined Mr. Barker's drug organization no later than December 23, 2002, when he agreed to travel to Cleveland to collect on Mr. Barker's drug debts, and in fact did so on the following day. More specifically, a rational jury could find that Mr. Hamilton's conduct relating to the Cleveland trip was interdependent with the activities of Mr. Barker's drug organization.

Trial testimony established that after family members learned of Mr. Barker's December 23 arrest in Kansas, Mr. Diaz and Mr. Gayle booked tickets on a commercial flight to Cleveland. Mr. Diaz testified that he feared Mr. Adolphus might have "set . . . up" Mr. Barker to be arrested, and his intent for the trip was to collect the drug money before Mr. Adolphus "could get his hand on it" so that the money could be used for Mr. Barker's bail and legal representation. Aplt. App. at 1871-72. Ms. Adauto testified that Faith Hamilton called Mr. Hamilton and asked him to go as well because she was afraid for Mr. Diaz's safety. Ms. Adauto tried to dissuade Mr. Hamilton from going. Although she noted that the collection of drug debts had not ordinarily been dangerous, she suspected that Mr. Barker's arrest might make it more difficult for anyone to get Mr. Barker's debtors to honor their obligations. Even though the relationship of Mr. Barker

14

and Mr. Hamilton was strained, Mr. Hamilton nonetheless insisted on participating in the collection trip because "he couldn't live if something happened to his brother and he wasn't there." *Id.* at 1190.

We cannot conclude that this trip constituted a separate conspiracy unrelated to Mr. Barker's ongoing drug distribution organization. Initially, even if we assume *arguendo* that Mr. Hamilton's characterization of the Cleveland trip as a "one-time" incident is correct—although the trip apparently involved multiple acts of collection on drug debts—that fact is immaterial to the question of whether Mr. Hamilton acted interdependently with Mr. Barker's drug organization. *See Pack*, 773 F.2d at 266. We must assess the nature and objectives of Mr. Hamilton's conduct in that one-time incident. As noted below, we conclude that Mr. Hamilton's conduct associated with the Cleveland trip was calculated to, and in fact did (albeit not to the fullest extent), meaningfully contribute to the success of Mr. Barker's drug operation; consequently, Mr. Hamilton's conduct functioned interdependently with the operation. *Cf. United States v. Evans*, 970 F.2d 663, 673 (10th Cir. 1992) (holding that evidence was insufficient to connect defendant to charged drug conspiracy, *inter alia*, where act of loaning scales for weighing narcotics to conspirators "could have been merely a gratuitous favor or isolated act among friends.").

Furthermore, it is irrelevant to the question of Mr. Hamilton's participation *vel non* in Mr. Barker's drug organization that the Cleveland trip did not directly pertain to the distribution of drugs, but rather the collection on drug debts. *See United States v.*

15

*Johnston*, 146 F.3d 785, 790 (10th Cir. 1998) (upholding defendant's drug conspiracy conviction where defendant's "lie would give [coconspirator drug dealer] more time to collect the money that his customers . . . owed him"); *see also United States v. Smith*, 26 F.3d 739, 744 (7th Cir. 1994) ("Joining a distribution conspiracy does not require an agreement to distribute personally. For example, an agreement to further the conspiracy's efforts to obtain drugs for distribution may constitute the type of cost-reducing agreement at which the law of conspiracy aims."). Moreover, it is likewise of no moment whether Mr. Hamilton personally profited financially from his alleged involvement in Mr. Barker's drug organization; for present purposes, we focus instead on whether Mr. Hamilton shared a common purpose with the organization and whether his actions facilitated Mr. Barker's endeavors or, more generally, the activities of Mr. Barker's organization.[6] *Hutchinson*, 573 F.3d at 1035-36.

---

[6] We decline Mr. Hamilton's invitation to categorically exclude from conspiracy liability the financially selfless conspirator. The case Mr. Hamilton relies upon for the necessity of an individual financially profiting from conspiratorial activity makes no such assertion. *See United States v. McIntyre*, 836 F.2d 467, 471 (10th Cir. 1987). *McIntyre* addressed whether the government had proved more than a buyer-seller relationship; we declined to give any significance to the fact that the defendant had on two occasions purchased cocaine and shared it with a purported coconspirator, because such evidence did not reveal a common unlawful goal; "[t]here [was] no indication that defendant was making a profit or distributing cocaine when he merely shared his purchases with his friends present at the time of sale." *Id.* This is an unremarkable conclusion about the absence of a common unlawful goal. *McIntyre* does not establish that a conspirator must make a monetary profit to be found guilty of conspiracy. Instead of the promise of financial gain, Mr. Hamilton may well have been motivated to some degree by a familial sense of loyalty and obligation to assist his half-brother, Mr. Barker. *See* Aplt. App. at 1190 (reporting Mr. Hamilton's statement that "he couldn't live if something happened to his brother [Mr. Barker] and he wasn't there"). But it goes

(continued...)

16

Importantly, Mr. Hamilton's insistence that he was involved in an one-time concerted scheme to collect money in traveling to Cleveland elides a central inquiry concerning the ends sought to be achieved by the trip. Mr. Hamilton's sister, Mitchell, testified about the reasons Mr. Hamilton offered her, in explaining his decision to take the trip. Among other things, Mitchell indicated that Mr. Hamilton informed her that he wanted to collect the money to repay Mr. Barker's drug source in Arizona. Specifically, Mitchell testified that Mr. Hamilton and Faith Hamilton discussed the fact that Mr. Barker's drug source in Arizona, Catalina Alcoverde, had "fronted" the drugs that were seized in Kansas—that is, she had provided the drugs on consignment but was expecting payment once Mr. Barker sold them. *See generally United States v. Hardwell*, 80 F.3d 1471, 1498 (10th Cir.) ("'Fronting,' or supplying drugs on consignment or on credit, is a known practice among drug dealers."), *reh'g granted in part on other grounds*, 88 F.3d 897 (10th Cir. 1996). Ms. Alcoverde was now being threatened by her own suppliers, who fronted the drugs to her, because she had not received the money from Mr. Barker necessary to pay them. Mitchell Hamilton testified that Mr. Hamilton felt obligated and that he said, "Cathy [Alcoverde] shouldn't worry about it because he was going to take care of it. He was going to make sure that she got the money that she needed." Aplt.

---

[6](...continued)
without saying that if the means Mr. Hamilton chose to act on that familial sense involved furthering Mr. Barker's illegal drug business, then familial sense would not immunize him from prosecution as a drug conspirator. *See, e.g.*, *United States v. Maliszewksi*, 161 F.3d 992, 1007 (6th Cir. 1998) (affirming conviction of father as conspirator in drug operation of his three sons, noting that his conduct in assisting the drug operation "goes far beyond a benign, hovering fatherly presence").

17

App. at 1037.

We conclude that that a rational jury could infer from the fact that Mr. Hamilton's participation in the Cleveland trip was significantly motivated by his desire to ensure that Mr. Barker's drug supplier got paid that Mr. Hamilton's conduct was interdependent with Mr. Barker's drug business in that it "facilitated the venture as a whole." *Ailsworth*, 138 F.3d at 851. Consequently, under the circumstances of this case, Mr. Hamilton's argument that he was not a member of Mr. Barker's drug organization, such that the Kansas venue was properly imputed to him, fails.

In particular, it would be reasonable for a jury to conclude that by ensuring that Mr. Barker's supplier (i.e., Catalina Alcoverde) got paid for the fronted drugs and that she could satisfy her obligations to her suppliers, Mr. Hamilton was helping to protect the long-term viability of Mr. Barker's drug organization. With Mr. Hamilton's help, it would be an organization that honored the debts created by "front" arrangements. This would likely encourage suppliers, including Ms. Alcoverde, to continue fronting drugs to the Barker organization. They could do so with some assurance that they would not be left exposed—because they had not received payments from Mr. Barker's drug organization—to adverse consequences from their own front suppliers. The bottom-line result would be that, with Mr. Hamilton's help, Mr. Barker's organization could continue to deal drugs. Therefore, the jury had before it powerful, sufficient evidence that when Mr. Hamilton decided to travel to Cleveland, he effectively had rejoined Mr. Barker's organization and committed to acting interdependently with it.

18

Our decision in *Johnston* is instructive. There, we summarized the pertinent facts:

> Robert Johnston was a defense attorney in Oklahoma City. Richard Jarvis, a drug dealer who previously had used Johnston for legal representation on other matters, asked Johnston to lie on Jarvis's behalf by telling two men to whom Jarvis owed drug money that Jarvis had been arrested. The purpose of the false story was to deter the two men from making further contact with Jarvis. Johnston complied with Jarvis's request, and Jarvis was never bothered again about the money he owed. Thereafter, Jarvis continued to deal drugs. For his lies, Johnston was convicted of [*inter alia*] one count of conspiracy to distribute marijuana . . . .

*Johnston*, 146 F.3d at 788. The request for intervention in *Johnston* involved a fronting scenario similar to the one that prompted Mr. Hamilton to act. The drug dealer, Mr. Jarvis, was in a very tough spot: the two men to whom he owed money had fronted him drugs; but "the drug business was slow" and, consequently, the customers to whom Mr. Jarvis had in turn fronted drugs could not pay him; and the two men apparently were inclined "to kill Jarvis if Jarvis did not soon pay off the balance of the debt." *Id.*

In upholding Mr. Johnston's conviction, we rejected his contention that there was insufficient evidence that he entered into a drug conspiracy. *Id.* at 790-91. We concluded that a rational jury could find that Mr. Johnston knew that Mr. Jarvis was still dealing drugs and that the purpose of his lie was to stave off Mr. Jarvis's two creditors so that Mr. Jarvis could continue collecting on drug debts and thereby preserve the viability of his drug business. *Id.* As we noted, there was "ample evidence" from which a reasonable jury could find that "Johnston really intended to help Jarvis continue his drug business," and in fact, with the breathing room that Johnston's lies bought him, "Jarvis continued to

19

deal drugs." *Id.* at 788, 789, 790. In other words, we supported our ultimate conclusion as to the sufficiency of the evidence of Mr. Johnston's entry into the drug conspiracy with proof that Mr. Johnston acted interdependently with it (i.e., he endeavored to facilitate the accomplishment of the conspiracy's drug-dealing objectives). As in *Johnston*, a rational jury could have concluded that Mr. Hamilton's decision to intervene and undertake the Cleveland trip to ensure that Mr. Barker's drug supplier (i.e., fronter of drugs) got paid demonstrated that he was acting to facilitate the objectives of Mr. Barker's drug-dealing organization by keeping the organization on a solid footing with its drug suppliers.

We also reached a similar conclusion where a defendant strived to fortify and ensure the ongoing viability of a large-scale drug-dealing organization, which operated out of a motel called the Alpine Rose, by making sure that no customer left the motel empty-handed. *See Hutchinson*, 573 F.3d at 1036. In *Hutchinson*, we reasoned:

> The jury could have reasonably concluded that, if [defendant] was not available to fill orders when the other dealers ran dry, customers would have to be turned away. And if this happened too many times, the Alpine Rose might lose its reputation as a "drive-thru" market where crack was available on demand. On this view of the evidence, a view compelled by our standard of review, [defendant] was plainly integral to the success of the operation, and interdependence was shown.

*Id.* Mr. Hamilton's conduct in connection with the Cleveland trip warrants a similar conclusion.

In sum, we conclude that there was sufficient evidence that Mr. Hamilton acted interdependently with the activities of Mr. Barker's drug organization when he traveled to

Cleveland to collect on the organization's drug debts, with a principal goal being to pay off Mr. Barker's drug supplier. Consequently, we reject Mr. Hamilton's argument that he did not rejoin that organization when he agreed to undertake the Cleveland trip on December 23, 2002. Mr. Hamilton's entry into the single conspiracy charged in the indictment means that there was no variance, prejudicial or otherwise, from the terms of the indictment. And, given that it is undisputed that Mr. Hamilton's coconspirators committed an overt act in Kansas, that act is attributable to Mr. Hamilton and the district court properly found venue to lie in Kansas.[7]

## B.    Suppression of Evidence

Mr. Hamilton argues that the district court improperly denied his pretrial motion to suppress evidence seized by law enforcement in the encounter at the Van Nuys Airport. Mr. Hamilton presents several arguments under the Fifth and Fourth Amendments. In the

---

[7]    In arguing against the conclusion that he rejoined Mr. Barker's organization, Mr. Hamilton also points to evidence of alleged competition between purported conspirators: in particular, evidence relating to Mr. Diaz's fear of Mr. Adolphus's intentions with regard to the Cleveland drug debt money and Mr. Diaz's goal of preventing Mr. Adolphus from getting that money. We find this line of argument to be unpersuasive. The case law upon which Mr. Hamilton relies does not categorically hold that evidence of competition between individuals precludes finding a conspiracy. In *United States v. Small*, 423 F.3d 1164 (10th Cir. 2005), moreover, we noted that "[t]he goals of all the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at cross purposes . . . . [and] so long as there is sufficient proof of mutual dependence and assistance." *Id.* at 1184 (internal quotation marks omitted). It is not clear to us that Mr. Hamilton was at cross-purposes with Mr. Adolphus; but, at any rate, there was "mutual dependence and assistance" between Mr. Hamilton, Mr. Gayle, and Mr. Diaz for the benefit of Mr. Barker and his organization. This constitutes "proof that the conspirators intended to act together for their shared mutual benefit within the scope of the conspiracy charged." *See Heckard*, 238 F.3d at 1231 (emphasis, alterations, and internal quotation marks omitted).

21

Fifth Amendment area, Mr. Hamilton contends that certain of his statements should be suppressed due to violations of *Miranda v. Arizona*, 384 U.S. 436 (1966), and that his statements also were coerced such that the physical evidence seized as a result of them should be suppressed. Mr. Hamilton also contends that physical evidence seized by law enforcement should be suppressed under the Fourth Amendment because the seizure stemmed from his arrest without probable cause, that his consent to search his shoulder bag was involuntary because he was handcuffed and had the barrel of the sergeant's pistol focused on him, and that his consent was tainted by the antecedent Fourth Amendment violation. Because we conclude that Mr. Hamilton failed to present any of these arguments to the district court and has not demonstrated good cause for this failure, we consider all of them waived.

"When a motion to suppress evidence is raised for the first time on appeal, we must decline review." *United States v. Brooks*, 438 F.3d 1231, 1240 (10th Cir. 2006); *see also United States v. Buchanan*, 985 F.2d 1372, 1380 (8th Cir. 1993) ("A defendant who believes that evidence has been illegally obtained must make a motion to suppress it before trial, or the objection is deemed to be waived."). Federal Rule of Criminal Procedure 12(e) states, "[a] party waives any Rule 12(b)(3) defense, objection, or request [including a defense, objection or request involving suppression of evidence] not raised by the [pre-trial] deadline" that the court establishes.[8] Fed. R. Crim. P. 12(e); *see United*

---

[8] Rule 12 was revised in 2002 and, as a consequence, subsection (e) incorporated the substance of then-subsection (f). But by virtue of this revision, the

(continued...)

*States v. Rose*, 538 F.3d 175, 185 (3d Cir. 2008) ("Under Federal Rule of Criminal

Procedure 12, a federal criminal defendant is barred, absent good cause, from raising a

reason to suppress evidence for the first time on appeal. This conclusion finds support in

the Criminal Rules' text, their history, our Court's case law, and the policy underlying

Rule 12."); *United States v. Santos Batista*, 239 F.3d 16, 19 (1st Cir. 2001) (noting, as to

Rule 12 provision providing for waiver, "[t]his is mandatory language, and the rule

applies broadly").

We have held that "this waiver provision applies not only to the failure to make a

pre-trial motion, but also to the failure to include a particular argument in the motion."

*United States v. Dewitt*, 946 F.2d 1497, 1502 (10th Cir. 1991); *see United States v. Banks*,

451 F.3d 721, 727 (10th Cir. 2006) (noting the general rule that "a party's failure to raise

a specific argument in a suppression hearing results in waiver on appeal"); *see also*

*United States v. Pope*, 467 F.3d 912, 918-19 (5th Cir. 2006) ("We have also held that

failure to raise *specific issues or arguments* in pre-trial suppression proceedings operates

as a waiver of those issues or arguments for appeal."); *cf. United States v. Torres*, 162

F.3d 6, 11 (1st Cir. 1998) ("A litigant cannot jump from theory to theory like a bee

buzzing from flower to flower. . . . [W]hen a party fails to raise a theory at the district

court level, that theory is generally regarded as forfeited and cannot be advanced on

---

[8](...continued)
drafters "intend[ed] to make no change in the current law regarding waivers of motions or defenses." Fed. R. Crim. P. 12 advisory committee's note (2002 Amendments). Therefore, we rely freely on judicial decisions interpreting, and commenting on the effect of, the previous subsection (f).

appeal.").

We have observed that "[t]here are a number of policy reasons for requiring defendants to move to suppress evidence prior to trial" and for deeming their failure to do so to be a waiver. *Brooks*, 438 F.3d at 1240. Among other things, because the exclusionary rule was crafted more to benefit society at large by deterring overzealous police conduct than to personally benefit defendants, "the exclusionary rule should be used sparingly in instances where its deterrent effect on police violations is minimal (as with appellate review for plain error)." *Id.*; *see Pope*, 467 F.3d at 919 (noting that "little deterrence of unacceptable police conduct is lost by refusing to review suppression claims not raised in the district court" (internal quotation marks omitted)). Furthermore, there are fairness concerns militating in favor of a waiver rule because "although the government can appeal an adverse ruling on a suppression motion prior to trial, it cannot do so once jeopardy has attached, as would be the case on appeal." *Brooks*, 438 F.3d at 1240; *see Pope*, 467 F.3d at 919. Similarly, "if a defendant is able to challenge the inclusion of evidence upon appeal, the government will face the difficult task of defending itself based on a potentially meager record." *Brooks*, 438 F.3d at 1240; *see United States v. Cormier*, 220 F.3d 1103, 1113 (9th Cir. 2000) (holding suppression argument waived and noting that defendant's "failure to raise the issue before the district court has left us without the benefit of any factual findings"); *cf. United States v. Hewlett*, 395 F.3d 458, 460 (D.C. Cir. 2005) ("Although we expect many things of our district court judges, telepathic powers are not among them.").

24

Mr. Hamilton filed a timely pretrial motion to suppress evidence, and the district court held a lengthy evidentiary hearing before denying the motion. The motion focused exclusively on alleged violations of *Terry v. Ohio*, 392 U.S. 1 (1968). Mr. Hamilton argued that the police officers did not have reasonable suspicion of criminal activity that would justify detaining him at the airport. Even if the initial stop was justified, he reasoned, the scope and duration of the detention was excessive. In the context of the scope-of-detention argument, Mr. Hamilton argued that it was not reasonable for law enforcement to continue detaining him "after learning that he was not in possession of the vehicle which had previously been reported stolen." Aplt. App. at 49. Linking the allegedly unlawful *Terry* stop to the garnered evidence, the motion stated, "[t]he evidence at the suppression hearing will reveal that no probable cause existed for the *search of the luggage*, nor did Mr. Hamilton consent to such a search." *Id.* at 50 (emphasis added).

On appeal, Mr. Hamilton first argues that the circumstances of the detention constituted "custody," triggering the requirement that a suspect be informed of his *Miranda* rights before any interrogation. Further, he argues that there was a second *Miranda* violation after he invoked his right to remain silent, when the sergeant allegedly asked him who owned the suitcase. Finally, Mr. Hamilton argues that his statements to the sergeant were coerced and therefore "all physical fruits of his statements should have been suppressed." Aplt. Br. at 39. However, these arguments regarding custodial interrogation, *Miranda* violations, and coerced statements were not raised in the motion or at the evidentiary hearing. Nor were Mr. Hamilton's arguments predicated on the Fifth

25

Amendment.

Mr. Hamilton also argues on appeal (1) that the officers' show of force and use of handcuffs rendered the detention an unlawful arrest without probable cause, (2) that this unlawful conduct rendered his consent to search his shoulder bag involuntary, and (3) that his consent was tainted by the antecedent unlawful arrest. Thus, Mr. Hamilton reasons that the evidence seized due to his consent to search should be suppressed. To be sure, these arguments are indirectly related to the *Terry* stop argument raised in the suppression motion, because a *Terry* detention may be transformed into a custodial arrest under certain circumstances. *United States v. Melendez-Garcia*, 28 F.3d 1046, 1051-52 (10th Cir. 1994); *cf. Cortez v. McCauley*, 478 F.3d 1108, 1115-16 (10th Cir. 2007) (en banc). However, the motion did not sufficiently provide notice to the district court of such an escalation-to-arrest argument.

Indeed, the motion assumed that Mr. Hamilton's detention was not an arrest and focused on the alleged absence of reasonable suspicion to support the detention. *See* Aplt. App. at 48 (arguing that "Mr. Hamilton's detention [was] without reasonable suspicion"); *id.* at 50 ("The appropriate remedy . . . is suppression of items seized, as well as [of] any statements allegedly made by Mr. Hamilton during this *illegal detention, and subsequent arrest*." (emphasis added)). The only reference to the scope of detention came when Mr. Hamilton was contending that it was improper to detain him once the officers learned that Mr. Diaz claimed the "stolen" vehicle. The only reference to "probable cause" pertained to the search of the luggage, *not* the seizure of Mr. Hamilton's

26

*person*. Therefore, Mr. Hamilton made no argument that the detention itself escalated into an arrest that required probable cause.

Furthermore, Mr. Hamilton's position before the district court was that he did *not* consent to the searches, not that his consent was involuntary. More specifically, Mr. Hamilton's suppression motion's assertion—"nor did Mr. Hamilton consent to such a search [of his luggage]," Aplt. App. at 50—did not provide notice of Mr. Hamilton's argument that his consent was involuntary due to the coercive nature of the encounter. The natural reading of the motion's assertion about consent is that it challenged whether Mr. Hamilton orally consented to the search of either his shoulder bag or the suitcase. That appears to be the way it was read by the district court when the court concluded that Mr. Hamilton consented to the search of his shoulder bag and that the subsequent search of the suitcase was justified by the intervening discovery of marijuana in the shoulder bag and the arrest of Mr. Hamilton. *See* Aplt. App. at 660 ("The officer asked Clive Hamilton if he could look inside the backpack that he carried. And the Court finds that Mr. Hamilton consented to that.").

Therefore, because Mr. Hamilton raises these suppression arguments under the Fifth and Fourth Amendments for the first time on appeal, we are inclined to view them as being waived. We recognize that Rule 12(e) does provide a "single narrow exception to the waiver rule." *Santos Batista*, 239 F.3d at 19. The rule provides that "[f]or good cause, the court may grant relief from the waiver." Fed. R. Crim. P. 12(e). And in applying the waiver rule to appellate review, we have noted that "a party's failure to raise

27

a specific argument in a suppression hearing results in waiver on appeal *unless* the party is able to show cause why it failed to raise the argument below." *Banks*, 451 F.3d at 727-28 (emphasis added); *see Dewitt*, 946 F.2d at 1502 (noting that the waiver provision "allows the court to grant relief from the waiver if the party is able to demonstrate cause for the failure to raise the argument"). Relief under this "narrow exception" is "rarely granted." *Santos Batista*, 239 F.3d at 19; *see also id.* (noting that relief is granted "only where there is a showing of cause and prejudice"); *United States v. Wilson*, 115 F.3d 1185, 1191 (4th Cir. 1997) (affirming district court's finding of lack of good cause where "[t]he record shows that sufficient information was available to defense counsel before trial that would have enabled him to frame his suppression motion to include the execution of the search warrant."); *cf. Dewitt*, 946 F.2d at 1502 ("[D]efendant has made no attempt to demonstrate cause for his failure to raise the issue. Furthermore, we have found no impediment to the defendant's ability to raise the issue.").

This narrow exception to waiver can offer Mr. Hamilton no succor. He has completely failed to offer an explanation or otherwise demonstrate good cause for his failure to raise his Fifth and Fourth Amendment suppression arguments before the district court. Mr. Hamilton made no showing of cause in his opening brief, and he declined to avail himself of the opportunity to file a reply brief in which such a showing might have been attempted, even after the government argued in its answer brief that he had waived his suppression arguments. Lastly, at oral argument, Mr. Hamilton did not even attempt to make a showing of cause related to his failure to present his suppression arguments to

28

the district court.  Instead, Mr. Hamilton focused almost entirely on his venue-related

challenge.  Accordingly, we hold that Mr. Hamilton has waived appellate review of his

suppression arguments under the Fifth and Fourth Amendments.[9]

---

[9]      We recognize that "[i]n several cases, we have engaged in plain-error review even after a defendant has failed to make a motion to suppress evidence prior to trial." *Brooks*, 438 F.3d at 1240 n.4.  At least some of our sister circuits have strongly questioned the correctness of this approach. *See, e.g.*, *Rose*, 538 F.3d at 182-83 ("Though each of Rule 52(b) [providing for plain error review] and Rule 12 [providing for waiver] appears applicable when read alone, when considered together we believe Rule 12's waiver provision must prevail.").  Even though we acknowledge that plain error review is a possible option under our precedent, that does not avail Mr. Hamilton.  Our cases counsel that, under the circumstances of this case, either plain error review is inappropriate altogether or a conclusion of plain error is untenable.  We have stated that "plain error review is not appropriate when the alleged error involves the resolution of factual disputes." *United States v. Easter*, 981 F.2d 1549, 1556 (10th Cir. 1992).  The resolution of the Fifth and Fourth Amendment claims that Mr. Hamilton advances on appeal are heavily dependent on the character of the established facts. *See Dewitt*, 946 F.2d at 1502 (noting that "the unlawful detention inquiry is fact intensive").  Indeed, Mr. Hamilton's arguments on appeal acknowledge as much.  For example, Mr. Hamilton recites the factual circumstances that courts must evaluate in determining whether a defendant is in custody for *Miranda* purposes, Aplt. Br. at 34, and he notes that under the Fourth Amendment the voluntariness of his consent to search must be "determined by considering the totality of the circumstances in which the statement was made," *id.* at 39.  Accordingly, plain error review is likely inappropriate here; waiver would appear to be most apt. *See Easter*, 981 F.2d at 1556 ("[B]ecause Defendant failed to raise this fact-dependent issue in the court below, he has waived it on appeal, and plain error review does not apply.").  Furthermore, even if we applied plain error review, the fact-dependent nature of Mr. Hamilton's claims would prevent us from reaching a conclusion that any error by the district court satisfied the plain error standard. *See United States v. Svacina*, 137 F.3d 1179, 1187 (10th Cir. 1998) ("This court has held repeatedly that factual disputes not brought to the attention of the court do not rise to the level of plain error.").  In order to satisfy the rigorous plain error standard, a defendant must establish *inter alia* that the alleged error is obvious and clear. *See, e.g.*, *United States v. Wardell*, 581 F.3d 1272, 1291 (10th Cir. 2009).  By failing to present the claims to the district court, Mr. Hamilton effectively prevented the court from making factual findings that would be germane to the disposition of Mr. Hamilton's claims.  Ironically, in finding fault with the district court for failing to make certain findings, Mr. Hamilton underscores that there are

(continued...)

29

## C.      Trial Error

Mr. Hamilton argues that the district court erred in not granting a mistrial after trial testimony implicated his right to remain silent. The prosecutor asked the sergeant, "Once you found the marijuana, the stun gun, the small amount of cash, the cell phones, what happened next?" Aplt. App. at 1574. The sergeant replied, "I went ahead and placed Mr. Hamilton under arrest and I read him his constitutional rights. And he chose not to talk to me." *Id.* Mr. Hamilton immediately moved for a mistrial, and the district court instructed the jury to disregard the statement. The trial then recessed for lunch; upon returning from the break, the district court denied the mistrial motion after reviewing the five factors in *United States v. Massey*, 687 F.2d 1348, 1353 (10th Cir. 1982). The district court then

---

[9](...continued)

holes in the record concerning significant matters. *See, e.g.*, Aplt. Br. at 48 ("The district court made no findings as to whether the officers use of force was justified or whether it exceeded the scope of a *Terry* stop."); *cf. id.* at 40 ("Nothing in the record suggests that [the sergeant] holstered his weapon before interrogating Hamilton."). Accordingly, we would not be situated on this sparse and deficient record to conclude that any errors by the district court concerning Mr. Hamilton's Fifth and Fourth Amendment claims were obvious and clear. *See United States v. Meraz-Peru*, 24 F.3d 1197, 1198 (10th Cir. 1994) ("A reliable appellate determination concerning the issues inherent in the stop of Mr. Meraz-Peru, his subsequent investigative detention, and finally his consent to search is not possible in the absence of factual findings. . . . On this record, it is not obvious or clear that the stop, investigative detention or subsequent consent violated the Fourth Amendment because the facts are hardly unanimous that the encounter was unconstitutional." (citation omitted)); *Dewitt*, 946 F.2d at 1502 ("Although defendant moved prior to trial to suppress the evidence, he never presented the unlawful detention issue to the court. . . . [T]he entire record before us centers on the consent issues. . . . On the basis of this record, we do not find plain error in the district court's admission of the evidence."). Consequently, even if we were to apply plain error review to Mr. Hamilton's claims, he could not prevail under this rigorous standard because any alleged errors could not be deemed to be obvious and clear.

read a curative instruction to the jury.

It is undisputed that the sergeant's testimony was improper. *See United States v. Burson*, 952 F.2d 1196, 1201 (10th Cir. 1991) ("[O]nce a defendant invokes his right to remain silent, it is impermissible for the prosecution to refer to any Fifth Amendment rights which defendant exercised."). However, such errors are not fatal if they can survive harmless error analysis. *See United States v. Lauder*, 409 F.3d 1254, 1261-62 (10th Cir. 2005) (subjecting such a violation to the harmless error analysis outlined in *Chapman v. California*, 386 U.S. 18, 24 (1967), "under which the beneficiary of a constitutional error must prove beyond a reasonable doubt that the error complained of was harmless" (alterations and internal quotation marks omitted)). A constitutional error is harmless "if 'it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *United States v. Holly*, 488 F.3d 1298, 1307 (10th Cir. 2007) (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)).

We have identified five factors of particular relevance in determining whether the error contributed to the verdict:

1. The use to which the prosecution puts the postarrest silence.

2. Who elected to pursue the line of questioning.

3. The quantum of other evidence indicative of guilt.

4. The intensity and frequency of the reference.

5. The availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions.

31

*Massey*, 687 F.2d at 1353 (internal quotation marks omitted). Employing these factors, we conclude that the error here was harmless.

First, the only mention of Mr. Hamilton's silence was the sergeant's one sentence. The prosecution made no use of it. Second, the district court found that the government neither elected to pursue the line of questioning nor solicited the answer. We agree. *Cf.* *Lauder*, 409 F.3d at 1261 ("The agent's statement was not used by the prosecution as substantive evidence of guilt. Instead, the agent, unprovoked by the prosecution, blurted out the statement in a manner that did not advance the government's case in any particular way."). Mr. Hamilton argues that the prosecutor should have known not to ask the open-ended question, "What happened next?" because the sergeant had testified similarly at the evidentiary hearing. However, such testimony in an evidentiary hearing is not constitutional error, and this record provides no indication that the prosecution expected the sergeant to respond as he did. Third, the ample evidence of Mr. Hamilton's guilt indicates that this mention potentially would have had only limited influence upon the jury. Fourth, the sole reference to Mr. Hamilton's silence was brief, factual, and nonaccusatory. *Cf. id.* at 1261-62 ("[H]ere we are dealing with one off-the-cuff comment that was not repeated or highlighted at any other point in the trial.").

If the first four factors were not sufficient to assure us that the error was harmless, the district court's response removes all doubt. Immediately after the inappropriate statement, the district court informed the jury:

> [T]he last answer that this witness gave is stricken from the record,

32

and you are to disregard it entirely. Which means not to consider it now; not to consider it during your deliberations. That testimony is highly inappropriate and something that every law enforcement officer should know is highly inappropriate at anytime in any case. It's violative of any number of rights.

Aplt. App. at 1577. When the trial reconvened after the lunch break, the district court instructed the jury as follows:

> Ladies and gentlemen of the jury, before we resume with testimony, let me instruct you as follows. The Fifth Amendment of the United States Constitution endows each and every one of us with the right to remain silent in the face of questioning or interrogation by a law enforcement officer at a time in which we are arrested or in custody. It's a right that every one of us has under the Fifth Amendment of the United States Constitution.
>
> It violates that constitutional right and it would be inappropriate, it would be illegal, and it would be unconstitutional for you as a jury to give any evidentiary weight, any consideration, to anything that you've heard about someone invoking this very important constitutional right.
>
> So don't give it any evidentiary weight; don't consider it, discuss it, think about it; don't draw any inferences from it. Don't think about it even in terms of inference or implication. Because it would be unconstitutional and illegal for you to do that.
>
> It would mean that that very important right that we all enjoy as United States citizens would be utterly meaningless if the fact that we invoked that right could then be used against us in a negative way.

*Id.* at 1595-96. "Jurors are presumed to follow the judge's instructions." *United States v. Templeman*, 481 F.3d 1263, 1266 (10th Cir. 2007). This instruction is quite thorough.

Indeed, we have found less comprehensive instructions sufficient to ameliorate similar error. *See, e.g.*, *Battenfield v. Gibson*, 236 F.3d 1215, 1225 (10th Cir. 2001) ("[T]he trial

33

court sustained the objection and admonished the jury to disregard the comment. . . . [W]e are persuaded that the trial court's admonition was sufficient to cure any error arising out of the prosecutor's comment."). Therefore, considering all of the *Massey* factors, we are confident that the error here was harmless beyond a reasonable doubt. The district court did not err in denying the motion for a mistrial.

**D.      Sentencing**

We review Mr. Hamilton's sentence for reasonableness, giving deference to the district court under "the familiar abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 594 (2007); *see United States v. Smart*, 518 F.3d 800, 805-06 (10th Cir. 2008). Although Mr. Hamilton's brief on appeal recites the fact that reasonableness "has both procedural and substantive components," *see United States v. A.B.*, 529 F.3d 1275, 1277 (10th Cir.) (internal quotation marks omitted), *cert. denied*, 129 S. Ct. 440 (2008), he does not argue that the length of his sentence is unreasonable. *See id.* at 1278 (describing the "substantive component" as asking "whether the length of the sentence is reasonable considering the statutory factors delineated in 18 U.S.C. § 3553(a)" (internal quotation marks omitted)). Instead, he challenges two discrete aspects of the Guidelines calculation: whether his base offense level improperly relied on drug quantities that could not be attributed to the conspiracy, and whether there was insufficient evidence to support his role enhancement under U.S.S.G. § 3B1.1(a). Therefore, we review only the procedural reasonableness of the sentence, examining whether the district court "improperly calculat[ed]" the Guidelines range. *Gall*, 128 S.

34

Ct. at 597; *see, e.g.*, *United States v. Saavedra*, 523 F.3d 1287, 1289 (10th Cir. 2008)

(declining to review substantive reasonableness where defendant "challenges only the

procedural reasonableness of his sentence"). We review the district court's legal

conclusions regarding the Guidelines de novo and its factual findings for clear error.

*United States v. Muñoz-Nava*, 524 F.3d 1137, 1146 (10th Cir. 2008).

### 1. Base Offense Level

Mr. Hamilton's first argument is that the district court erred in employing a base

offense level of thirty-four pursuant to U.S.S.G. § 2D1.1(c)(3) for an offense involving at

least 3000 kilograms of marijuana. The district court described two alternative

methodologies for reaching this amount. First, the district court relied on the calculations

in the Presentence Investigation Report ("PSR") that Mr. Hamilton's personal drug

trafficking involved at least 5184 kilograms of marijuana.[10] Then, the district court

concluded that although Mr. Hamilton had split off from Mr. Barker's organization for a

period of time, "they had realigned in December 2002 when Mr. Barker was arrested and

Mr. Hamilton came to his aid." Aplt. App. at 2325. The district court's second method

---

[10] Ms. Adauto testified that Mr. Hamilton brought $200,000 to $300,000 back from his flights to Philadelphia at least twice a month over a period of approximately ten months, yielding at least four million dollars. To estimate the amount of drugs sold to produce this return of cash, the PSR turned to Mr. Barker's testimony, which suggested that he purchased marijuana from Ms. Alcoverde for about $350 per pound. One would have to sell 11,428.57 pounds of marijuana at $350 per pound to gross four million dollars. This corresponds to 5184 kilograms of marijuana. The district court concluded that because Mr. Hamilton and Mr. Barker operated out of the same region, at around the same time, there was "no reason to believe that Mr. Hamilton was paying an amount significantly lower or significantly higher from the amount being paid by Mr. Barker." Aplt. App. at 2323-24.

of calculation would add, in addition to the 5184 kilograms, another 1363 kilograms—the amount of drugs found on the airplane in Kansas and the amount of drugs necessary to result in the cash seized upon Mr. Hamilton's return from Cleveland.[11]  This would make Mr. Hamilton accountable for 6547 kilograms of marijuana.  However, the district court chose not to rely on this possibility.

On appeal, Mr. Hamilton does not dispute the calculations.  He argues only that the 5184 kilograms came from Mr. Hamilton's drug trafficking "prior to any joinder of the two conspiracies."  Aplt. Br. at 61.  The issue before us is whether the 5184 kilograms Mr. Hamilton trafficked is "relevant conduct" under U.S.S.G. § 1B1.3 that may be used to set the base offense level.  Mr. Hamilton focuses his argument on disputing any application of § 1B1.3(a)(1)(B), which provides for including in the computation of the base offense level "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  However, that provision has little application here.[12]  Mr. Hamilton is not being held responsible for drug quantities stemming from

---

[11]     The 564 pounds of marijuana seized in Kansas converts to 256 kilograms, and one would have to sell 1107 kilograms of marijuana at $350 per pound to gross the $852,405 found in Mr. Hamilton's suitcase upon his return from Cleveland.

[12]     That section might not permit Mr. Hamilton to be held accountable for the 256 kilograms of marijuana found on Mr. Barker's airplane in Kansas.  *See* U.S.S.G. § 1B1.3 cmt. n.2 ("A defendant's relevant conduct [under § 1B1.3(a)(1)(B)] does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct. . . .").  But it would not prevent Mr. Hamilton from being held responsible for the at least 1107 kilograms that correlates to the $852,405 that was seized at the Van Nuys airport.  Section 1B1.3(a)(1)(A) includes "all acts and omissions committed, *aided*, *abetted*, counseled, commanded, induced,

(continued...)

36

"acts and omissions of *others*." U.S.S.G. § 1B1.3(a)(1)(B) (emphasis added). Instead, he is being held accountable for his *own* actions.

To the extent that Mr. Hamilton is arguing that the trial evidence did not establish that the 5184 kilograms he personally trafficked were part of the conspiracy for which he was convicted, we note that the district court did not make a specific finding that Mr. Hamilton trafficked that amount while a member of Mr. Barker's organization. However, that is of no moment because we need not rely on § 1B1.3(a)(1)'s inclusion of "all acts and omissions committed . . . by the defendant . . . that occurred during the commission of the offense of conviction." *Id.* § 1B1.3(a)(1). We rely instead on § 1B1.3(a)(2), which permits inclusion of "all acts and omissions described in subdivision[] (1)(A) . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* § 1B1.3(a)(2). "[A] sentencing court may look beyond the charges alleged in the indictment and may consider quantities of drugs not alleged in calculating a defendant's base offense level, provided the drugs were part of the same course of conduct or common scheme or plan as the offense of conviction." *United States v. Roederer*, 11 F.3d 973, 978 (10th Cir. 1993) (citations and internal quotation marks omitted); *see also* U.S.S.G. § 2D1.1 cmt. n.12 ("Types and quantities of drugs not

---

[12](...continued)
procured, or willfully caused by the defendant." *Id.* § 1B1.3(a)(1)(A) (emphasis added). And the application note clarifies that the reasonable foreseeability requirement "does not apply to conduct that the defendant *personally* undertakes, aids, [or] abets" because "such conduct is addressed under subsection (a)(1)(A)." *Id.* § 1B1.3 cmt. n.2 (emphasis added). However, neither of these amounts was the basis actually used for the base offense level here.

specified in the count of conviction may be considered in determining the offense level.").

In defining "same course of conduct" under U.S.S.G. § 1B1.3(a)(2), we have concluded that "[s]imilarity, regularity, and temporal proximity are the significant elements to be evaluated."[13] *Roederer*, 11 F.3d at 979; *see also United States v. Rios*, 22 F.3d 1024, 1028 (10th Cir. 1994). The term "looks to whether the defendant repeats the same type of criminal activity over time. It does not require that acts be connected together by common participants or by an overall scheme. It focuses instead on whether defendant has engaged in an identifiable behavior pattern of specified criminal activity." *Roederer*, 11 F.3d at 979 (alteration and internal quotation marks omitted). Further, "a change in the operation's *modus operandi* . . . need not affect the same course of conduct inquiry when the defendant's continued involvement in the specified type of criminal activity . . . remains evident." *Id.* (internal quotation marks omitted). Applying these principles, *Roederer* held that drug distribution in a separate conspiracy which ended five years before the offense of conviction was the "same course of conduct" because the evidence showed the "same type of criminal activity (distribution of cocaine)," defendant's conduct was "sufficiently similar," and the instances were "temporally

---

[13] The Guidelines application note has adopted the same set of factors. *See* U.S.S.G. § 1B1.3, cmt. n.9(B) ("Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required.").

proximate." *Id.* at 980.

Mr. Hamilton's assertion of separate distribution conspiracies thus provides no obstacle to sentencing liability here under the "same course of conduct" inquiry. Mr. Hamilton's allegedly independent actions involved the same type of activity as charged in the conspiracy, i.e., marijuana distribution. Although his distribution activity may have centered on Philadelphia, while Mr. Barker's involved Cleveland and other locations, that does not make the crimes dissimilar. The regularity of the marijuana distribution is clearly established. And Mr. Hamilton's actions occurred within sufficient temporal proximity to his participation in Mr. Barker's conspiracy, perhaps even overlapping with it. Therefore, we find no error in the district court's use of a base offense level of thirty-four because Mr. Hamilton's relevant conduct involved at least 5184 kilograms of marijuana, which is well over § 2D1.1(c)(3)'s 3000-kilogram threshold for that offense level.

### 2. Role Enhancement

Mr. Hamilton's last challenge to his sentence is that the district court erred in applying a four-level enhancement under U.S.S.G. § 3B1.1(a) for a leadership role in a criminal activity that involved five or more participants. "In evaluating the application of a Guidelines enhancement, we review factual findings for clear error, but to the extent the defendant asks us to interpret the Guidelines or hold that the facts found by the district court are insufficient as a matter of law to warrant an enhancement, we must conduct a de novo review." *United States v. Scott*, 529 F.3d 1290, 1300 (10th Cir. 2008) (alterations

and internal quotation marks omitted).

To qualify for the enhancement under U.S.S.G. § 3B1.1(a), trial evidence must show that Mr. Hamilton "was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a); *see also United States v. Wilfong*, 475 F.3d 1214, 1218 (10th Cir. 2007). The Guidelines application note explains that relevant factors include "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, . . . the degree of participation in planning or organizing the offense, . . . and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1(a) cmt. n.4; *see also United States v. Sallis*, 533 F.3d 1218, 1223 (10th Cir.), *cert. denied*, 129 S. Ct. 614 (2008). Also, while the criminal activity requires five or more participants, the leadership role need only be over "one or more other participants." U.S.S.G. § 3B1.1(a); *see also United States v. Gallant*, 537 F.3d 1202, 1241 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 2026 (2009). "This is not a particularly onerous showing: 'The Guideline requires only a conclusion that [the defendant] supervised at least one such participant; it does not require the court to identify specific examples.'" *Gallant*, 537 F.3d at 1241 (alteration in original) (quoting *United States v. Aptt*, 354 F.3d 1269, 1287 (10th Cir. 2004)).

The district court concluded that the enhancement was applicable because it found that trial evidence supported the conclusion that Mr. Hamilton directed the actions of "at least" the following individuals:

Melanie Adauto, his live-in girlfriend who ran his front business and

> laundered drug proceeds for him; also, Brian Diaz and Sean Gayle, who assisted Mr. Hamilton in collecting drug money in Cleveland; also, Clarence Adolphus, who arranged drug flights for Mr. Hamilton; also Faeth Hamilton, who laundered money by arranging for fraudulent financing of real property and vehicles; and finally, Mitchell Hamilton, who effectively laundered $130,000 in drug proceeds through the purchase of her home, having obtained a so-called loan from Mr. Clive Hamilton to do that.

Aplt. App. at 2327.

In contending that the district court erred, Mr. Hamilton relies on the same distinction we rejected under the venue-related argument—the notion that he did not join Mr. Barker's conspiracy but only entered a limited and separate conspiracy with Mr. Diaz and Mr. Gayle to collect the drug money. Under this theory, Mr. Hamilton argues that it would be error to apply the role enhancement to him because the conspiracy did not involve the requisite five individuals and because he did not direct the activities of Mr. Diaz or Mr. Gayle.

However, in light of our conclusion that Mr. Hamilton entered Mr. Barker's conspiracy when he chose to become involved in the trip to Cleveland, there can be no doubt that the conspiracy involved at least five participants. We need not address whether the district court was correct to find support for this enhancement in Mr. Hamilton's direction of Ms. Adauto, Faith Hamilton, Mitchell Hamilton, or Mr. Adolphus. Because leadership over one other participant is enough for this enhancement, we need only examine whether the district court's factual finding that Mr. Hamilton directed Mr. Diaz and Mr. Gayle on the Cleveland trip is clearly erroneous. *See Wilfong*,

41

475 F.3d at 1219.

We conclude that the district court's finding is well supported by the evidence. Our inquiry need go no further than Mr. Diaz. Although Mr. Diaz may have begun organizing the trip, once Mr. Hamilton became involved, the evidence suggests that he took over. He dispensed with the travel plans that Mr. Diaz had arranged, instead setting up a charter flight to be paid for by his own company. Mr. Hamilton told Mr. Diaz how to find the airport they would be leaving from. And Mr. Hamilton left Mr. Diaz to guard the cash in a hotel room, while he and Mr. Gayle collected the money. Finally, when the men deplaned at the Van Nuys Airport, Mr. Hamilton took control of the suitcase containing the money. These actions are sufficient evidence of planning, organizing, and exercising decisionmaking authority over Mr. Diaz. Therefore, application of the § 3B1.1(a) enhancement was not erroneous.

In sum, the district court did not clearly err in its drug quantity computation and in its application of the role enhancement. Therefore, we find no sentencing error.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** Mr. Hamilton's conviction and sentence.